| | |
|---|---|
| **ROBINSON BROG LEINWAND GREENE**<br>  **GENOVESE & GLUCK P.C.**<br>875 Third Avenue<br>New York, New York 10022<br>A. Mitchell Greene<br>Fred B. Ringel<br>*Attorneys for the Debtor and Debtor in Possession* | **Hearing Date and Time:**<br>**October 29, 2019 at 10:00 a.m.** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

In re:                                                               Chapter 11

**AAGS HOLDINGS LLC,**                              Case No: 19-13029 (SMB)

                           Debtor.
----------------------------------------------------------X

**DEBTOR'S OPPOSITION TO MOTION OF QPS 23-10 DEVELOPMENT
LLC FOR ENTRY OF AN ORDER (I) DISMISSING CHAPTER 11 CASE,
OR, IN THE ALTERNATIVE, (II) EITHER (A) DETERMINING THAT THE
AUTOMATIC STAY DOES NOT APPLY TO PURCHASE AGREEMENT
OR (B) VACATING STAY WITH RESPECT TO PURCHASE AGREEMENT**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

      **AAGS HOLDINGS LLC,** the debtor and debtor in possession herein (the "Debtor"), by its attorneys, **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**, together with the accompanying Declaration of Justin Erlich dated October 19, 2019 (the "Erlich Decl."), Declaration of Gary Segal dated October 22, 2019 (the "Segal Decl."), and Declaration of Joseph M. Marger dated October 22, 2019, as and for its opposition to the Motion of QPS 23-10 Development LLC ("QPS") for Entry of an Order (I) Dismissing Chapter 11 Case, or, in the Alternative, (II) Either (A) Determining that the Automatic Stay Does Not Apply to Purchase Agreement or (B) Vacating Stay With Respect to Purchase Agreement (the "Motion"), respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.     The Motion should be denied in its entirety since this case was commenced in good faith by the Debtor to reorganize its financial affairs by protecting its rights in a valuable executory contract, the Agreement of Purchase and Sale dated July 17, 2019 (the "PSA") for the purchase of real property located at 23-10 Queens Plaza South, Queens, New York (the "Property") owned by QPS.

2.     The Debtor's case was filed because QPS would not grant the Debtor an extension of the September 20, 2019 at 10:00 a.m., time of the essence closing deadline (the "Closing Deadline") on reasonable terms despite its representation it would do so. *See* Erlich Decl. at ¶2. On September 19, 2019, the Debtor's lender, Churchill Real Estate Fund MALLC ("Churchill") requested an extension from QPS, and Kevin Maloney, QPS's managing partner agreed to a two week extension provided the terms of the Debtor's request were reasonable and on September 19, 2019, QPS emailed Churchill its terms for an extension. *Id.*

3.     Churchill informed the Debtor of QPS's terms for a proposed extension of the Closing Date. *See* Segal Dec. at ¶3. The terms were for an extension of up to four weeks, with $500,000 additional hard deposit per week for the first two weeks, a $200,000 additional hard deposit for the third week, and a fourth week granted without any additional deposit, but with the entire additional $1.2 million being released from escrow. *Id.* This amounted to a $1.2 million fee for a four-week extension. *Id.* The Debtor believed that the amount of the fee was exorbitant and unreasonable. *Id.* However, QPS also conditioned an extension of the Closing Date on parties unrelated to the Debtor providing an adjustment of claims against QPS and providing releases to QPS in matters completely unrelated to the PSA, concessions that the Debtor was in no position to give. *Id.* QPS's additional demands, combined with the $1.2

million extension fee, was excessive and a demand that the Debtor was unable to meet. *Id.*

4.  QPS's assertions that the Debtor filed this case in bad faith are premised on nothing more than generalized allegations that the Debtor was acting improperly to extend its time to close by filing the case and was a shell entity with no business operations. But QPS denied the Debtor an extension of the Closing Deadline, while purporting to hold a "closing" when QPS itself was not ready, willing, and able to close on the Closing Date. QPS offers up only conclusory statements that they were ready to close but offers no evidence that it actually complied with all of the deliverables required under the PSA. *See* Segal Dec. at ¶4

5.  More importantly, the Debtor's case was filed prior to the expiration of PSA's time is of the essence closing condition. As discussed in more detail below, there is no case law, and QPS cites to none, that states that a "time of the essence" closing condition must be satisfied by the closing being completed by the "time" stated in the contract of sale. The reason why the seller cited to no case for that proposition, is that no court has given a time of the essence closing condition such a nonsensical construction. Rather New York state courts require that such a condition be satisfied by a closing being completed on the "law day." Incredibly, QPS appears to argue that the Debtor's rights should be forfeited because it filed its petition a mere *16 minutes* after the closing was scheduled to start. Not surprisingly, QPS cites no cases to support that result.

6.  Here, since the Debtor filed before the time of the essence closing date condition was triggered and certainly before any notice of default was served,[1] and therefore arguably the Debtor can either assume the PSA under section 365 of the Bankruptcy Code or cure its default

---

[1] QPS's counsel emailed a notice of default to Debtor's counsel at 10:35 a.m. on the petition date in violation of the automatic stay. *See,* 11 U.S.C. § 362 (a)(3). Notably, serving such notice is an admission by QPS that notice of the default was required by the PSA. However, since such notice was given after the filing of the petition by AAGS, it was done in violation of the automatic stay and hence is void. *See, In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("actions taken in violation of the automatic stay are void and without effect").

and close under the PSA pursuant to the 60 day extension of time provided for under section 108(b) of the Bankruptcy Code. Towards that end, the Debtor has already filed its plan of reorganization (the "Plan") and disclosure statement on October 11, 2019, with confirmation scheduled for October 29, 2019, which is plainly within the time period afforded to the Debtor to close on the PSA pursuant to section 108(b) of the Bankruptcy Code. The Plan provides for exit financing in an amount sufficient to close on the PSA and pay the Debtor's creditors in full with interest. The Debtor has already filed its exit loan financing term sheet (ECF Doc. No. 23) and on the basis of the Debtor's filed Plan and its ability to cure any default under the PSA through its Plan, the Motion must be denied.

**ARGUMENT**

**I.   THE MOTION SHOULD BE DENIED BECAUSE THIS CASE
      WAS FILED IN THE UTMOST GOOD FAITH**

7.   QPS seeks dismissal pursuant to section 1112(b) of the Bankruptcy Code. This unsupported "bad faith" allegation is routinely made in cases where the Debtor is a holding company formed prior to the petition date for the sole purposes of acquiring or developing real property. This Court has recognized "the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). QPS's Motion, coming less than a month into the Debtor's case, is devoid of any proof of intentional bad faith.

8.   The Court is empowered to dismiss a chapter 11 case or modify the stay for "cause" based on a filing made in bad faith. *See C-TC 9th Avenue P'ship*, 113 F. 3d 1304 (2d Cir. 1997). In *C-TC*, a partnership which was in dissolution, filed a petition thereby staying an almost-completed foreclosure action. The court held that the debtor filed to frustrate the

legitimate efforts of its secured creditor who was foreclosing on the debtor's sole asset.

9. The Second Circuit established the following criteria as indicia of a debtor's bad faith filing:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;  (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*C-TC*, 113 F.3d at 1311.  However, the inference of "bad faith" is not established through the rote recitation of the *C-TC* factors.  Courts applying the *C-TC* criteria engage in a detailed factual analysis to determine if the Debtor's filing constitute an abuse of judicial process.

10. For example, in *Century/ML Cable Venture*, the bankruptcy court found that even where some factors may weigh in favor of dismissal, "the Court does not engage in a mechanical counting exercise, the Court believes that the . . . filing does not warrant dismissal for cause, as an overview of the . . . situation suggests that chapter 11 relief is warranted."  294 B.R. 9, 35 (Bankr. S.D.N.Y. 2002).  In *In re Sletteland*, when a shareholder group sought to dismiss, as a bad faith filing, an individual debtor's chapter 11 filed after losing a derivative action, the Court noted:  "[I]n reality, there is a 'considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.'" 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) (*citing In re Cohoes Industrial Terminal, Inc.*, 931 F. 2d 222 (2d Cir. 1991)).

11. In this case, an examination of the *C-TC* factors shows that they weigh heavily against dismissal of this case, despite QPS's misinterpretation of the *C-TC* factors as they apply

to the Debtor's chapter 11 case. First, factors (1), (6), and (8)[2] (single asset debtors, little cash flow and no employees) should not be mechanically applied here, as the Debtor is a holding company formed for the specific purpose of purchasing the Property. Use of a holding company is routine in sophisticated real estate transactions, particularly where lenders require the borrowers to be special purpose entities ("SPE"). *See* Segal Decl. at ¶2. Holding companies or SPEs will only have one asset and no employees as they engage in no other business, other than to act as owner of the property being purchased, but the Bankruptcy Code does not statutorily preclude such entities from filing for chapter 11 relief. *Id.* Indeed, QPS's argument would require dismissal whenever any holding company sought chapter 11 protection. This allegation is merely a distraction.

12. Factor (3) is inapplicable. The Debtor is not subject to any foreclosure action or other litigation. For the same reason, factor (4) does not apply, as this is not a two-party dispute. While there are only, of course, two parties to the PSA, the rights and obligations running in favor of the Debtor's creditors are also at risk, as are the interests of the Debtor's members and the $100,000 deposit currently held by QPS. Moreover, the PSA was not the subject of prepetition litigation between the parties as the Debtor was not in default at the time it filed, which will be explained in more detail below.

13. The only factors submitted by QPS that bear any relevance to this case are factors (2) and (5). With respect to factor (2), the Debtor has filed its schedules of creditors, which show eight creditors with claims totaling $1,193,861.36. *See In re Walden Ridge Dev., LLC*, 292 B.R. 58, 64 (Bankr. D.N.J. 2003) (court found 13 creditors with general unsecured claims totaling $351,700 to be sufficient). As to factor (5), the timing of the filing does not evidence any

---

[2] Similarly, factor (7) is not applicable here. There is no evidence that the Debtor is failing to pay its current expense and it is not currently liable for real property taxes.

{01030703.DOC;4 }                               6

intent to delay and frustrate QPS's "legitimate" efforts to enforce its rights.  Rather, the Debtor filed its case to preserve its rights and close on the PSA.  Additionally, the Debtor has no secured creditors, but regardless, the Debtor is seeking to move its case along as expeditiously as possible as evidenced by the fact that the Debtor has already filed its Plan and scheduled confirmation on shortened notice for October 29, 2019, a date that is a little over a month after the petition date.  Accordingly, based on an analysis of the *C-TC* factors, it is clear that this case was not filed in bad faith.

14.	However, QPS's attempts to analogize the Debtor's filing to that of *In re Gel, LLC*, where the court set forth the proposition that for a bona fide corporate reorganization, there must be "assets, liabilities, creditors, employees and business operations."  495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012).  As stated above, the Debtor has a significant asset as a contract vendee to the PSA and it has creditors.  Nevertheless, QPS fails to mention that this was not the basis for dismissal, but rather, the case was dismissed because the *Gel* debtor could not show "a reasonable likelihood that a plan will be confirmed within a reasonable time frame."  *Id.* at 248.  This is not the case here as the Debtor already has a plan of reorganization scheduled for confirmation.

15.	QPS also cites to *In re Integrated Telecom Express, Inc.*, for the premise that a debtor cannot file for bankruptcy solely to take advantage of a Bankruptcy Code provision.  Again, QPS is wrong.  As stated in QPS's Motion, the key distinction in *Integrated Telecom*, is that the Third Circuit found that "[b]ecause Integrated was not in financial distress, its Chapter 11 petition was not filed in good faith as it could not – and did not – preserve any value for Integrated's creditors that would have been lost outside of bankruptcy."  *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 129

(3d Cir. 2004). The Third Circuit further stated that: "[j]ust as a desire to take advantage of the of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law." *Id.* at 127. Every debtor seeks to take advantage of the protections offered by the Bankruptcy Code. *Id.* Here, the Debtor was in financial distress based on its inability to close on the Closing Date, however, the PSA has significant value and by filing a Plan that calls for the purchase of the Property under the PSA and payment of all creditors, the Debtor is indeed preserving value for its estate and creditors, unlike *Integrated*.

16. Similarly, QPS also miscites *In re Empire Equities Capital Corp.*, 405 B.R. 687 (Bankr. S.D.N.Y. 20019). While, *Empire Equities* alludes to the notion that a party seeking an extension of time pursuant to section 108(b) of the Bankruptcy Code on a time of the essence contract, could be dismissed for an improper purpose, there is no improper purpose here. *Id.* at 693. The Debtor is clearly in financial distress and is seeking to exit already by filing its Plan. Like the debtor in *Empire Equities*, the Debtor did file prior to the expiration of the Closing Date and can take advantage of the 60-day period under section 108(b) of the Bankruptcy Code, as will be discussed in more detail below. QPS then cites to *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60 (E.D.N.Y. 2012) that a bankruptcy court, as a court of equity, may dismiss a case for an abuse of the bankruptcy process. As a factual matter, the case in *Clear Blue Water* was dismissed for bad faith because the debtor "was not an 'honest but unfortunate debtor'; but rather was a debtor whose principals or agents . . . engaged in fraudulent conduct." *Id.* at 70. Here, there are no allegations of fraud. Further, in order to appeal to equity, one must have clean hands as well. *See Toledano v. Toledano*, 322 B.R. 78, 82 (Bankr. S.D.N.Y. 2005) ("one must give equity, to get equity"). On the eve of the Closing Date, QPS countered the Debtor's request for a two-week extension with a demand for $1.2 million in additional deposit,

plus a demand that parties unrelated to the Debtor, in an unrelated transaction to the PSA, adjust certain fees and waive claims against QPS. The Debtor filed its chapter 11 case based on the actions of QPS.

17. The other cases cited by QPS do not support dismissal either but are merely cited for the notion that "cause" for dismissal includes a filing made in bad faith. However, only the facts in *SGL Carbon* support a bad faith dismissal, and the facts in *SGL Carbon* are distinguishable from the Debtor. With respect to *In re SGL Carbon Corp.*, a Third Circuit case, the Debtor's petition was found to be in bad faith because the *SGL* debtor was not in any financial distress. 200 F.3d 154, 166 (3d Cir. 1999) ("SGL Carbon's financial disclosure documents give no indication the company needed to reorganize under Chapter 11 protection).

18. The facts in *Cohoes Indus. Terminal* and *Schur Management* also do not support bad faith dismissals. In *In re Cohoes Indus. Terminal*, the second circuit found that the Debtor's chapter 11 petition was not frivolous. 931 F.2d 222, 230 (2d Cir. 1991). Similarly, while the debtor's case in *In re Schur Management* was dismissed, it was not dismissed for cause, but rather because the filing was premature. 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005) ("[a]lthough dismissal for prematurity falls under the rubric of a 'bad faith' filing, there should be no implication here that either [d]ebtor or its counsel acted in actual bad faith"). The other cases cited by QPS merely recite the *C-TC* factors and are factually distinguishable. *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) (debtor's primary motivation in filing was to forestall foreclosure "for years" and filing over 700 miles from location of property and creditors was additional evidence of bad faith); *In re Kaplan Breslaw Ash, LLC*, 264 BR. 309, 335 (Bankr. S.D.N.Y. 2001) (case dismissed for bad faith, for among other things, that debtor filed for purpose of maintaining ownership of property, without satisfying debt and unsecured

creditors would not benefit from filing); *234-6 West 22nd St. Corp.*, 214 B.R. 751 at 760-61 (finding of bad faith basis to lift the automatic stay, not dismissal, because debtor's second filing was done solely to take advantage of automatic stay and in the 2 ½ years since previous filing, debtor did nothing to improve its financial condition).

19. Moreover, where a case is in its early stages and a possibility of reorganization exists, dismissal is not warranted. *In re Cardinal Congregate I*, 113 B.R. 371 (Bankr. S.D. Ohio 1990); *see also In re Foundry of Barrington Partnership*, 129 B.R. 550 (Bankr. N.D. Ill. 1991). In *In re Cardinal Congregate I*, creditors moved to dismiss the case within two months after the filing of the voluntary petition. The bankruptcy court found that because the case was in existence for only a short time, it could not conclude that the debtor had no reasonable probability of rehabilitation. *In Re Cardinal Congregate I*, 113 B.R. at 374. Significantly, the *Cardinal Congregate I* Court specifically noted that the exclusive period to file a plan had not expired, and that the debtor had manifested its intention to file a plan. *Id.*

20. The Debtor has been in chapter for only a month and has already filed its Plan and scheduled a confirmation hearing. The Debtor should be given the opportunity to confirm its Plan in the face of the Motion.

21. It is well-settled that the burden to establish cause for dismissal or conversion rests squarely on the party seeking such relief. *In re Greene*, 57 B.R. 272, 276 (Bankr. S.D.N.Y. 1986). QPS has failed to carry that burden. For these reasons, the Debtor's case should not be dismissed.

**II. THE PSA DID NOT TERMINATE AND THE AUTOAMTIC STAY REMAINS IN PLACE**

**A. Debtor Has Until the End of the Law Day to Close.**

22. Contrary to QPS's assertion, the PSA did not terminate prepetition and the

automatic stay remains in place. The Debtor does not dispute that the case was filed after 10:00 a.m. as set forth in the Closing Deadline, however, the PSA stated that closing "shall occur at 10:00 a.m.," meaning the closing shall begin at 10:00 a.m. PSA at § 4.1. A copy of the PSA is attached to the Declaration of Kevin Maloney (ECF Doc. No. 7) (the "Maloney Decl.") as **Exhibit B.** New York courts have stated that "[w]hen there is a declaration that time is of the essence . . . each party must tender performance on *law day*." *Grace v. Nappa*, 46 N.Y.2d 560, 566 (1979); *see also 533 Park Ave. Realty LLC v. Park Ave. Bldg. & Roofing Supplies LLC*, 2015 N.Y. Misc. LEXIS 5336 at *14 (N.Y. Sup. Ct. July 29, 2015) *rev'd on other grounds* 68 N.Y.S. 3d 110 (N.Y. App. Div. 2017). . ("each party must tender performance on law day rather than the law hour") (internal citations and quotations omitted); *see also Wolf v. Atai*, 527 N.Y.S.2d 481, 482 (N.Y. App. Div. 1988) (termination of closing unjustified "merely because they were unable to perform promptly at 10:00 a.m."); *Christopher St. Operating, Inc. v. 189 e. Third St. Realty, LLC*, 2010 N.Y. Misc. LEXIS 1358 at *23 (N.Y. Sup. Ct. Jan. 19, 2010) ("even where time is of the essence, a seller or buyer has the entire day to close, if necessary") (internal citations omitted).

23. Moreover, even QPS *own instruction letter* to the escrow agent (the "Escrow Letter") indicates that QPS planned for the closing to conclude on the law day after 10:00 a.m. on September 20, 2019 and not at 10:00 a.m. The Escrow Letter states in paragraph D, "[i]n the event all of the requirements set forth in Paragraph "B" hereof have not been satisfied <u>by 5:00 pm EST on [September 20, 2019]</u>, Escrow Agent is . . . authorized and directed to immediately return the Escrowed Documents." See Escrow Letter at Par. D (emphasis added), a copy which is attached to the Marger Decl. as **Exhibit A**. Accordingly, even QPS did not contemplate the closing would be completed by 10:00 a.m.

24. Because the Debtor filed prior to the end of the Closing Date, in this case at 10:16 a.m., QPS was unable to terminate the PSA as the Debtor was not in default at the time the petition was filed. *See* Notice of Bankruptcy Filing (the "Notice of Filing"), attached as **Exhibit F** to the Maloney Decl.

25. Because the PSA did not terminate, the automatic stay is still in place, and any attempts to terminate the PSA are violations of the automatic stay. Section 362(a)(3) of the Bankruptcy Code provides that "[a] petition filed under section 301 . . . of this tile . . . operates as a stay, applicable to all entities, of — (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C § 362(a)(3). The Debtor filed its chapter 11 case at 10:16 a.m. *See* Notice of Filing. At 10:35 a.m., counsel to QPS sent Debtor's real estate counsel an email stating that the "[Debtor] has defaulted under the PSA." A copy of the email is attached as **Exhibit B** to the Marger Decl. By sending notice of the default *after* commencement of the case, and in violation of the automatic stay, QPS was seeking to establish a default so that it can then terminate the PSA.

26. Courts have consistently found that sending notices that would alter a debtor's rights under an executory contract or otherwise assert control over estate property are violations of the automatic stay. *See, e.g.*, *In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 3926, at *55 (Bankr. S.D.N.Y. Sept. 9, 2014) (sending of post-petition notice of deacceleration violated automatic stay as it was an attempt to enlarge creditor's claim); *In re Solutia Inc.*, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007) (same); *Enron Corp.*, 300 B.R. 201 at 212 (enforcing agreement by sending notice of termination violated the automatic stay as an act to obtain and exercise control over property of the estate); *see also In re 48th Street Steakhouse*, 835 F.2d 427, 431 (2d Cir. 1987) (actions that would adversely impact property of estate barred by automatic stay). "The

automatic stay is designed to protect the status quo by precluding and nullifying postpetition actions against the debtor or its estate." *In re Moss*, 270 B.R. 333, 341-42 (Bankr. W.D.N.Y. 2001) (internal citation omitted).

27. Accordingly, the automatic stay prohibits and nullifies QPS's notice of default, and the significant diminution of the Debtor's rights under the PSA which would result. QPS intends that this notice be the first step in its efforts to terminate the PSA and retain the escrow deposit as damages. As such, they are plainly violative of the stay and void. *Enron Corp.*, 300 B.R. 201 at 212 ("actions taken in violation of the automatic stay are void and without effect").

28. However, despite the fact that such a default notice violates the automatic stay, the default was also premature as the Closing Date had not expired and the PSA does not terminate on its own upon a default. The PSA provides that upon a default by the Debtor, QPS "shall be entitled to terminate the [PSA] and retain the Downpayment." PSA at § 10.1  There is no automatic termination, so accordingly the notice of default is a violation of the automatic stay. Additionally, the default is also not effective notice as it was not sent pursuant to the notice provision set forth in section 14 of the PSA which directs notices to the Debtor to be delivered to (a) the Debtor c/o Russ & Russ P.C. and to Mintz and Gold by either personal delivery or by overnight courier. PSA at § 14. Accordingly, the PSA has not terminated on its own terms as asserted by QPS.

29. The cases cited by QPS are factually distinguishable because as set forth above the Debtor filed its chapter 11 case prior to the end of the Closing Date, therefore the PSA has not terminated, nor has it expired. *See In re Southold Dev. Corp.*, 134 B.R. 705, 705 (E.D.N.Y. 1991) (contract expired prepetition); *Westreich v. Bosler*, 934 N.Y.S.2d 37, 37 (N.Y. Sup. Ct. 2011) (no party showed up at the closing, nor was any act performed prior to the expiration of

the closing date); *Zelmanovitch v. Ramos*, 750 N.Y.S.2d 310, 310 (N.Y. App. Div. 2002 (same); *Rhodes v. Astro-Inc.*, 378 N.Y.S.2d 195, 197 (N.Y. App. Div. 1976) (seller could not deliver marketable title and performed no other act to extend closing).

### B. Time of the Essence Condition Was Not Satisfied by QPS.

30. Asides from the fact that the Debtor filed prior to the expiration of the Closing Date, QPS is unable to hold the time of the essence condition against the Debtor, because QPS was also not ready, willing, and able to close on the Closing Date. While it is convenient to state that they "prepared and circulated documents and instruments required to be delivery by QPS under the PSA at closing, and QPS delivered such documents and instruments to the escrow agent," Motion at ¶ 11. QPS does not provide any evidence of what was provided.

31. New York courts have held that "the purchaser is not required to tender performance and attend a closing if the seller is unable to perform on the law day." *533 Park Ave. Realty*, 68 N.Y.S. 3d 110 at 114; *see also Yu Ling Hu v. Zapas*, 969 N.Y.S.2d 491, 492 (N.Y. App. Div. 2013) (tender of performance not required when contracting party is unable to perform on law day). Because QPS has not provided evidence of all the necessary deliverables to close on the Closing Date, the Debtor was relieved of its obligation to tender performance on the Closing Date. On this basis, the time of the essence closing condition is invalid and the Debtor retains its ability to close on the PSA.

32. Prior to the Closing Date, the Debtor was advised by Reed Smith LLP ("Reed Smith"), the Debtor's prepetition real estate counsel that the title company only received those deliverables referenced in Schedule A and B of the Escrow Letter. *See* Segal Decl. at ¶ 4. A copy of the Escrow Letter and correspondence between Reed Smith and the title company are attached to the Marger Decl. as **Exhibits A and C**, respectively. Based on the PSA, these do not

encompass the entirety of what was to be delivered pursuant to section 8.1 of the PSA. *See* Segal Decl. at ¶ 4. Documents regarding QPS's authority to deliver the deed, certification regarding the representations and warranties set forth in the PSA, and proof of ability to pay transfer taxes have not been provided to Reed Smith or to the Debtor. *Id.* Further, the Debtor is unaware if the title company has received these missing deliverables. Based on the lack of evidence that all of the deliverables required under section 8.1 were in fact delivered, it does not appear that QPS was ready to close on September 20, 2019. *Id.*

33. Finally, QPS cites to *Parker Hannifin Corp. v. N. Sound Props.*, 2013 WL 1932109 (S.D.N.Y. May 8, 2013) for the proposition that any modification of a time is of the essence provisions must be made in accordance with the contract's term. The Debtor is not arguing that the Closing Date was modified, but rather that the Debtor filed prior to the expiration of the Closing Date, therefore, the Debtor still preserves its rights to cure any default under 108(b) of the Bankruptcy Code. According ally the cases cited by QPS with respect to termination of the PSA are inapposite and of no moment.

### III. THE AUTOMATIC STAY SHOULD NOT BE VACATED TO PERMIT TERMINATION OF THE PSA

34. In a similar argument, QPS argues that the automatic stay should be vacated to allow termination of the PSA because the Debtor still has rights in the PSA and intends to close on the PSA under its Plan, the automatic stay should not be vacated. Again, as stated above, the PSA cannot be terminated because the Debtor filed prior to the expiration of the Closing Date. While a contract with an incurable default cannot be cured and assumed as set forth in *Bell v. Alden Owners*, 199 B.R. 451 (S.D.N.Y. 1996) and *In re G.S.V.C. Rest. Corp.*, 10 B.R. 300 (S.D.N.Y. 1980), the Debtor can still cure because the Debtor filed prior to the expiration of the Closing Date. QPS is confusing the distinction between an incurable default that prevents

assumption under section 365 of the Bankruptcy Code versus curing a default under section 108(b) of the Bankruptcy Code.

35. The Debtor agrees with QPS's statement that *Empire* Equities and *New Breed* state that section 108(b) of the Bankruptcy Code "permit[] [a] debtor to extend for 60 days the period of time to perform the TOE closing, in both cases the TOE closing date had not expired before the bankruptcy cases were commenced." Motion at ¶42.

36. The facts of this case run parallel to the facts of *Empire Equities*. In *Empire Equities*, the Debtor filed prior to the expiration of an option to purchase certain real property. 405 B.R. 687 at 688. The bankruptcy court found that the expiration of the option contract was a material breach and terminated the defaulting party's right to enforce the contract, thus making this an incurable default and the option contract cannot be assumed under section 365. *Id.* at 691. However, the bankruptcy court found that section 108(b) gives broader rights than to cure a default, because it allows a debtor to "perform any other similar act" meaning it would allow the debtor to take up an option that would have otherwise expired. *Id.* at 692

37. Section 108(b) of the Bankruptcy Code states:

> [i]f . . . an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title [11 USCS § 1201 or 1301] may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of . . . 60 days after the order for relief.

11 U.S.C. § 108(b).

38. The language "perform any other similar act" was meant to give a debtor "60 days after the filing of a case to preserve the interest of the estate by doing those things which the debtor neglected to do or was unable to do within the originally prescribed time." *Empire Equities*, 405 B.R. 687 at 693 (*citing G-N Partners*, 48 B.R. 462 (Bankr. D. Minn. 1985)).

Similarly, the Debtor filed prior to the expiration of the Closing Date, thus under section 108(b) it should be allowed to purchase the Property despite the fact that the time of the essence deadline has since passed.

39.    The court in *New Breed* also states that because the debtor's time to tender performance had not expired on the petition date, the debtor would have had an additional 60 days to cure. *In re New Breed Realty Enters.*, 278 B.R. 314, 318 (Bankr. E.D.N.Y. 2002). Like *Empire Equities*, the Debtor's time to cure any defaults under section 108(b) has not expired. The Debtor has already filed its plan and does not intend to assume the PSA after its statutory time period under section 108(b) runs out.

40.    Again, QPS cites to a number of cases which state that a when a contract party materially defaults, it terminates that party's right to enforce the contract. However, the Debtor's rights are still preserved under section 108(b), so the cases cited by QPS in paragraph 38 of the Motion for that proposition are irrelevant as none of the cases cited are bankruptcy cases and therefore none of the parties sought to avail themselves of the benefits of section 108(b) of the Bankruptcy Code.

## **CONCLUSION**

41.    The Debtor respectfully submits that the facts of this case, when considered along with the pertinent case law, show that the Debtor has not acted in bad faith in commencing this case and filed its case prior to the expiration of the Closing Date. The Debtor's goal in initiating this Chapter 11 case is to perform all of its obligations under the PSA and be in a position to close on the PSA. To that end, the Debtor has filed its Plan which is scheduled for confirmation on October 29, 2019, the same date that the Motion is scheduled to be heard. The Debtor respectfully requests that the Court deny the Motion and allow for confirmation of the Plan.

**WHEREFORE**, the Debtor seeks the entry of an order denying the Motion and granting it such other and different relief as seems just, proper and equitable.

**DATED:** New York, New York
October 22, 2019

        **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
*Attorneys for the Debtor*
875 Third Avenue
New York, New York 10022
Tel. No.: 212-603-6300

By:  /s/ A. Mitchell Greene
     **A. Mitchell Greene**