**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re:                                                    Chapter 11

**AAGS HOLDINGS LLC,**                                    Case No.:  19-13029-smb

                                        Debtor.
-----------------------------------------------------------X

#### SECOND AMENDED DISCLOSURE STATEMENT
#### FOR SECOND AMENDED PLAN OF REORGANIZATION

**THIS DISCLOSURE STATEMENT HAS BEEN PRELIMINARILY APPROVED AS CONTAINING ADEQUATE INFORMATION AND IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR FINAL APPROVAL ON NOVEMBER 14, 2019 AT 10:00 A.M. IMMEDIATELY PRIOR TO THE HEARING ON CONFIRMATION SCHEDULED FOR NOVEMBER 14, 2019 AT 10:00 A.M. OF THE DEBTOR'S PLAN OF REORGANIZATION.**

**ROBINSON BROG LEINWAND GREENE**
**GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue
New York, New York 10022
(212) 603-6300

**Dated:** New York, New York
            November 11, 2019

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION OF AAGS HOLDINGS LLC, DATED NOVEMBER 11, 2019 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[1]  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN OTHER FACTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBE HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

{01031987.DOC;1 }

WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR AND DEBTOR IN POSSESSION IN THE DEBTOR'S CHAPTER 11 CASE. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

**SUMMARY**

AAGS Holdings LLC (the "Debtor"), has filed its *Amended Plan of Reorganization* dated November 11, 2019 and its *Second Amended Plan of Reorganization* dated November 11, 2019 (the "Plan"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This Second *Amended Disclosure Statement for the Second Amended Plan of Reorganization* (the "Disclosure Statement") has been **preliminarily approved** by the Bankruptcy Court as containing adequate information pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

A copy of the Plan accompanies this Disclosure Statement. A glossary of terms frequently used in this Disclosure Statement is set forth in Article 1 of the Plan. Words used but not defined herein shall have the meaning ascribed to such terms in the glossary.

The treatment of Claims under the Plan provides Creditors with payment in full on account of their claims. Debtor submits that the Plan therefore provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation.

**The Debtor believes that Confirmation of the Plan is in the best interests of Creditors.**

**THE DEBTOR**

Prior to the Petition Date, parties related to the Debtor were involved in two New York state litigations related to the failed development of two adjoining properties. In an effort to settle these litigations, the parties entered into a settlement agreement where, among other things, one of the properties subject to the litigation, the real property located at 23-10 Queens Plaza South, Queens, New York (the "Property"), which is owned by QPS 23-10 Development LLC ("QPS" or "Seller"), was to be sold to a newly formed entity, the Debtor. The Debtor believes that under the terms of the Settlement Agreement[2], QPS is obligated to pay from the sale proceeds generated by the closing, the sum of $1,200,000 to Russ & Russ P.C., as escrow agent, to hold such funds pending a determination of a sperate interpleader action Russ & Russ is required to commence pursuant to the Settlement Agreement.[3]

The Debtor is a limited liability company formed to purchase the Property. Debtor and Seller entered into an Agreement of Purchase and Sale dated July 17, 2019 (the "APS") to sell the Property to the Debtor for a purchase price of $27,500,000, with closing scheduled for September 20, 2019. The Debtor's emergency filing was precipitated by the Debtor's need for

---

[2] The Settlement Agreement is not attached to this Disclosure Statement due to the presence of a confidentiality provision in it. In addition, although the agreement gave rise to the APS, the Debtor is not a party to the Settlement Agreement. However, the Debtor will make the Settlement Agreement available to the Court for an *in camera* review, should the Court deem it necessary.

[3] The $1,200,000 payment was reflected as a deduction from the sale proceeds on the settlement statement from Royal Abstract, the title company selected to close the transaction, which was attached to the Affidavit of Ari Tran, ECF Doc No. 32 as Exhibit H.

{01031987.DOC;1 }

additional time to consummate the APS with the Seller and to avoid losing its rights under the APS and its $100,000 deposit.

## THE PLAN

The Plan provides for approval of the Exit Financing in an amount up to $29,750,000, which, along with an equity contribution from the Debtor's existing members of approximately $3,850,000 and an equity contribution from its new Churchill member in the amount of $250,000, there will be sufficient funds to make all payments required under the Plan, including funding the Purchase Price, payments to all creditors under the Plan (including professionals and reserves for disputed claims), payment of the fees and interest reserves required in connection with the proposed exit financing and the payment of the carrying costs for the property through the maturity date of the Exit Financing. Based upon the foregoing, upon the occurrence of the Effective Date, the Debtor will be able to immediately close on the acquisition of the Property pursuant to the APS under the terms of the Plan.

Upon the Closing, the Property will vest in the Post-Confirmation Debtor.

The table below provides a summary of the classification and treatment of Claims and Interests under the Plan. The figures set forth in the table below represent the Debtor's best estimate of the total amount of Allowed Claims in the Case. These estimates have been developed by the Debtor based on an analysis of the Schedules filed by the Debtor, the Proofs of Claims filed by Creditors and certain other documents of public record. The Bankruptcy Court has yet to set a deadline for the filing of proofs of claim, so the amounts below are subject to change. See "SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE -- Bar Date." Although the Debtor believes that the amounts of the claims set forth below are substantially correct, there can be no assurance that Claims will be allowed by the Bankruptcy Court in the amounts set forth below:

| Class and Estimated Amount[4] | Type of Claim | Summary of Treatment |
|---|---|---|
| $0.00 | Administrative Claims (excluding Claims for professional compensation and reimbursement, but including post-petition ordinary course liabilities) | **Non-Voting.** Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) the Closing Date, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; |

---

[4] The amounts set forth in this schedule are not, and should not be deemed admissions by the Debtor as to the validity or amount of any claim and the Debtor reserves all rights to object to any claim in this case.

{01031987.DOC;1 }

| Class and Estimated Amount[4] | Type of Claim | Summary of Treatment |
|---|---|---|
| | | *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto. |
| As of the Effective Date, Debtor's counsel fees and expenses will be approximately $150,000 | Administrative Claims for Professional Compensation and Reimbursement | **Non-Voting.** Each Person seeking an award by the Bankruptcy Court of Professional Fees shall file a final application for approval of compensation and reimbursement of reasonable and necessary expenses pursuant to section 330 of the Bankruptcy Code no later than the Administrative Bar Date. Any such application timely filed shall be deemed to be a Proof of Administrative Claim. No later than three days prior to the Effective Date, each such Professional shall provide the Disbursing Agent with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and prosecution of any such application. Unless otherwise agreed by such claim holder in writing, on the Effective Date the Disbursing Agent shall segregate sufficient cash to pay all such estimated compensation and expenses in full. Objections to any Professional's application for compensation or reimbursement must be filed and served upon such Professional, and the Disbursing Agent, in accordance with the Bankruptcy Rules. Any such objection not timely filed and served shall be deemed to have been waived. |
| Class 1 $593,861.36[5]. | General Unsecured Claims | **Unimpaired.** On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and |

[5] Excludes $600,000 claim of Churchill Real Estate, which is scheduled as contingent and disputed.

{01031987.DOC;1 }

| Class and Estimated Amount[4] | Type of Claim | Summary of Treatment |
|---|---|---|
| | | final satisfaction of such Claim, Cash equal to the Allowed amount of such Claim plus accrued post-petition interest at the Federal Judgment Rate on the Effective Date. |
| Class 2 | Interest Holders | **Unimpaired**.  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that an Interest Holder agrees to less favorable treatment, the holder of such Allowed Equity Interest shall retain such Interest. |

### PROPONENT'S RECOMMENDATION

In the Debtor's opinion, the treatment of Creditors under the Plan which provides for payment in full on account of their claims provides Creditors with at least as much as they would be entitled to receive in a liquidation under Chapter 7.  See "ALTERNATIVES TO THE PLAN."  The Plan as proposed provides for payment in full to each class of creditors and the conveyance of the Properties to the Debtor.

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.**

### SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

### RETENTION OF PROFESSIONALS

Section 327(a) of the Bankruptcy Code provides that the Debtor, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the Debtor in carrying out its duties under the Bankruptcy Code.  11 U.S.C. § 327(a).

On October 10, 2019, the Debtor sought authority from the Court to retain the law firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C., as its counsel.  The application was granted pursuant to an Order entered on October 17, 2019.

**MOTION TO DISMISS**

On October 3, 2019, QPS filed a motion to dismiss the chapter 11 case or alternatively for relief from the automatic stay. A hearing on the motion was held on October 29, 2019 and the motion to dismiss was denied by the Bankruptcy Court.

**BAR DATE**

In accordance with the requirements of section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, the Debtor has filed its Schedules, including schedules of all of its known creditors and the amounts and priorities of the Claims the Debtor believes are owed to such creditors. Pursuant to section 501 of the Bankruptcy Code, any creditor may file a Proof of Claim and, unless disputed, such filed Proof of Claim supersedes the amount and priority set forth in the Debtor's schedules. By order of the Bankruptcy Court dated October 7, 2019, November 18. 2019 was set as the last day for creditors to file Proofs of Claim in the Debtor's Chapter 11 case.

As a result of the Bar Date having been set after the date fixed for the confirmation hearing, the Debtor has had to make a good faith estimate of the claim that may be submitted by QPS as a result of the closing not proceeding on September 20, 2019 and instead proceeding as later as November 27, 2019, 69 days later.[6] The Debtor's sources and Uses annexed hereto as **Exhibit A** shows an estimate of this claim to be $344,977, consisting o0f estimated reasonable legal fees of $55,000, real estate taxes and water charges of $40,159, insurance costs of $3,781 and interest in the amount of $246,037 on the sales proceeds at the prime rate for 69 days. This amount or any different amount asserted by QPS may be subject to dispute by the Debtor.

There can be no assurance that the Allowed Claims as determined by the Bankruptcy Court will be in the amounts and priorities stated in the Schedules filed by the Debtor or the Proofs of Claim filed by the Creditors.

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtor is responsible for the filing of monthly operating reports with the Bankruptcy Court detailing the results of the Debtor's ongoing business operations. Monthly reports are filed regularly.

---

[6] Although November 27, 2019 is an outside date stipulated to by the parties, the Debtor may well seek to proceed immediately after entry of the Confirmation Order in the absence of any stay.

{01031987.DOC;1 }

## SUMMARY OF THE PLAN

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which accompanies this Disclosure Statement and which is incorporated herein by reference.

**Classification of Claims**

Article 3 of the Plan classifies the various Claims against the Debtor into one (1) class of Claims and one (1) Class of Interests:

Class 1 – General Unsecured Claims
Class 2 – Interests

Claims in Class 1 and Interests in Class 2 are unimpaired under the Plan. The votes of Holders of Claims in Classes 1 and 2 and Interests in Class 3 are therefore NOT being solicited, are NOT entitled to vote to accept or reject the Plan and are deemed to have accepted the Plan.  As set forth in Article 2 of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code, certain Administrative Claims against the Debtor have not been classified.  See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims."

### TREATMENT OF CLAIMS CLASSIFIED UNDER THE PLAN

Article 4 of the Plan provides for the treatment of the Claims and Interests classified in Article 3 of the Plan.

**Class 1 - Unsecured Claims.**  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, Cash equal to the Allowed amount of such Claim plus accrued post-petition interest at the Federal Judgment Rate on the Effective Date.

**Class 2 – Interests**.  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that an Interest Holder agrees to less favorable treatment, the holder of such Allowed Equity Interest shall retain such Interest.

### TREATMENT OF NON-CLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(2) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.  Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

{01031987.DOC;1 }

**Administrative Claims.**  Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) the Closing Date, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Debtor in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

Article 2 of the Plan sets a final date for the filing of Administrative Claims against the Debtor.  The Administrative Bar Date is the first Business Day that is 30 days after the Effective Date.

**Bankruptcy Fees.**  All fees and charges assessed against the Debtor under section 1930 of title 28 of the United States Code and any applicable interest thereon shall be paid in Cash in full as required by statute, and, until the closing, conversion or dismissal of this case, whichever is earlier, the Post-Confirmation Debtor shall continue to be responsible for the payment of any such fees and charges.

**Professional Fees.**  Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by a Debtor in a case under the Bankruptcy Code.  In general, "bankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11."  124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

With respect to Professionals' Fees, the Plan provides that, subject to the approval of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Debtor shall pay the Administrative Claims held by Bankruptcy Professionals as follows:

No later than three days prior to the Effective Date, each Professional shall provide the Debtor with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code.  Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.  Upon the receipt of such notice, Debtor shall segregate sufficient cash to pay all such estimated compensation and expenses in full unless otherwise agreed to by the Debtor and such Professionals; *provided, however,* that the failure of a Professional to provide such an estimate shall relieve the Debtor of its obligation to segregate funds for the payment therefore, but shall not relieve the Debtor of the obligation with respect to any allowed compensation and expense reimbursement.

{01031987.DOC;1 }

All Professionals shall file final applications for approval of compensation and reimbursement of reasonable and necessary expenses pursuant to section 330 of the Bankruptcy Code no later than the Administrative Bar Date.  Any such application timely filed shall be deemed to be a Proof of Administrative Claim.  No later than three days prior to the Effective Date, each such Professional shall provide the Disbursing Agent with an estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation pursuant to section 330 of the Bankruptcy Code.  Such estimates shall include estimated sums for the preparation and prosecution of any such application.  Unless otherwise agreed by such claim holder in writing, on the Effective Date the Disbursing Agent shall segregate sufficient cash to pay all such estimated compensation and expenses in full.  Objections to any Professional's application for compensation or reimbursement must be filed and served upon such Professional, and the Disbursing Agent, in accordance with the Bankruptcy Rules.  Any such objection not timely filed and served shall be deemed to have been waived.

DISPUTED CLAIMS

Article 7 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims asserted against the Debtor by any Entity.

**Time to Object.**  Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim filed may be filed no later than the later to occur of (i) 60 days after the Effective Date or (ii) 60 days after the date such Proof of Claim is filed.  Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, Claims shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (ii) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been listed in the Schedules.

DISTRIBUTIONS UNDER THE PLAN

Article 7 contains provisions governing the making of distributions on account of Claims.  In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim shall be deemed to be timely made if made on or within five days following the later of (i) the Closing Date or (ii) the expiration of any applicable objection deadline with respect to such Claim or (iii) such other time as provided in the Plan. All Cash payments to be made by the Debtor pursuant to the Plan shall be made by check drawn on a domestic bank.

**Disbursing Agent.**  Except for payments to be made by the title company at the Closing, the Disbursing Agent shall distribute all Cash or other property to be distributed under the Plan and may employ or contract such third parties as may be necessary to assist in or perform the distribution of Cash or other property under the Plan.  Pending the final distribution of all sums distributable under the terms of the Plan (including the delivery to the Debtor of unclaimed distributions pursuant to section 7.14 of the Plan), the Disbursing Agent shall have full authority to

sign checks on any bank account of the Debtor to the extent necessary to make any payment or distribution contemplated by the Plan.

**Method of Payment.**  Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

### UNCLAIMED DISTRIBUTIONS

Any Cash or other property to be distributed under the Plan shall revert to the Post-Confirmation Debtor if it is not claimed by the Entity entitled thereto before the later of (i) 90 days after the distribution date or (ii) 60 days after an Order allowing the Claim of that Entity becomes a Final Order or is otherwise Allowed.

### DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

**No Distribution Pending Allowance.**  Notwithstanding any other provision of the Plan, no payment or distribution of any kind shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order. However, the Disbursing Agent shall segregate Cash equal to 100% of the amount which would be distributed on account of such Disputed Claim if such Claim had been an Allowed Claim but for the pendency of the objection.

Until the dispute over the claim is resolved, the Disbursing Agent shall also segregate any interest or dividends earned upon such amount it is holding on account of such Disputed Claim.

**Distribution After Allowance.**  Within 30 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property held in escrow with respect to such claim, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.  Any segregated amounts remaining after all Disputed Claims have been resolved will be retained by the Debtor.

### SURRENDER OF INSTRUMENTS

No Creditor that holds a note or other instrument evidencing such Creditor's Claim may receive any distribution with respect to such Claim unless and until the note or other instrument evidencing such Claim is surrendered pursuant to the provisions of section 7.12 of the Plan.  That section also contains specific provisions governing lost, stolen, or mutilated notes and instruments, including the requirement that reasonable indemnification be provided to the Post-Confirmation Debtor or Disbursing Agent for such exchange.

COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Post-Confirmation Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements.

EFFECTIVE DATE

The Effective Date of the Plan is defined as the first Business Day after the Confirmation Order has been entered. It is intended that the Debtor will close on the Contract immediately after the Effective Date has occurred but, in all events, no later than November 27, 2019.

CONDITIONS TO THE EFFECTIVE DATE

The Confirmation Order must be entered by the Court and not be the subject of a stay.

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, the Debtor shall be authorized to perform its obligations under the APS.  At Closing, the balance of the Purchase Price shall be paid to QPS as set forth in the APS. In accordance with section 108(b) of the Bankruptcy Code, the Debtor has the right to perform under the APS by curing any default under the APS and close on the acquisition of the Property thereunder on or prior to November 27, 2019.[7]

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "Cure Amount") in full in Cash on at the Closing; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the Post-Confirmation Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that

---

[7] The time to close has been extended by agreement of the parties from November 19, 2019 to November 27, 2019 in accordance with a stipulation "so ordered" by the Court on November 6, 2019. ECF Doc. No.38.

such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Court). To the extent the Cure Dispute is resolved or determined against the Post-Confirmation Debtor, the Post-Confirmation Debtor may reject the applicable Executory Contract or Unexpired lease after such determination, and the counterparty may thereafter file a proof of claim.

### THE POST-CONFIRMATION DEBTOR

The Debtor shall continue in existence post-confirmation. Prior to confirmation and the acquisition of the Property, Greg Segal and Alex Adjmi will continue to manage the day to day affairs of the Debtor and Jay Russ will continue to be responsible for major decisions as set forth in the Debtor's pre-petition operating agreement.

After the transfer of the Property has been consummated, the Debtor shall enter into an amended and restated operating agreement[8] pursuant to which Churchill SP-QPS LLC (the "Churchill Member") shall be a fifty (50%) percent member and DS Partners LIC LLC (the "DS Member") shall be a fifty (50%) percent partner. DS Partners LIC LLC shall be owned 75% by Gary Segal and 25% by Spencer Laney, LLC. The DS Member shall be the Managing Member subsequent to the acquisition of the Property, provided, however, that all major decisions shall require unanimous consent of the members so long as the Exit Financing remains outstanding.

### IMPLEMENTATION OF THE PLAN

**Implementation.**    The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan including but not limited to: (a) closing on the Exit Financing, (b) performing under the APS, (c) distributing the remaining Exit Financing proceeds, Equity Contribution and Churchill Equity Contribution to pay Creditors under the Plan. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property by the estate or by any non-debtor third party, required by the Plan and to perform any act, including the satisfaction of any lien, that is necessary for the consummation of the Plan.

**Mechanism of Plan Funding.**    Funding for the Plan shall come from the proceeds of the Exit Financing, the Equity Contribution and the Churchill Equity Contribution. Prior to Confirmation of the Debtor's Plan, the Debtor's members and Churchill will negotiate and agree on the terms of an amended and restated operating agreement to take effect subsequent to the Debtor's acquiring title to the Property under the APS. In addition, the Debtor's members shall put into escrow with the Disbursing Agent fifty (50%) percent of the membership interests of the Debtor which interests shall be transferred to Churchill immediately after the delivery of the deed to the

---

[8] Attached as **Exhibit B** is the proposed amended and restated operating agreement which will be executed substantially form as annexed hereto.

Property to the Debtor.

Prior to Confirmation, Churchill shall fund the Exit Loan by depositing the loan proceeds with the Disbursing Agent and the Debtor shall execute and deposit with the Disbursing Agent the Exit Financing Loan Documents to be effective upon the delivery of the Deed to the Debtor. When notified that the title company is ready to close, the Disbursing Agent shall transfer the loan proceeds to the title company to be disbursed to the Seller and the Exit Lender as required for the Debtor to acquire the Property and Churchill to acquire a first lien on the Property in accordance with its Exit Financing Loan Documents. Upon being notified by the title company that the closing has occurred, the Amended and Restated Operating Agreement of AAGS shall be effective without further action of or authorization by any of the Debtor's members and the fifty (50%) percent membership interests in the Debtor deposited with the Disbursing Agent shall be transferred to Churchill-SP QPS LLC without further action of or authorization by any of the Debtor's members.

The balance of the funds held by the Disbursing Agent in excess of those necessary to pay for the acquisition of the Property and the expenses of the Exit Loan shall be held by the Disbursing Agent to fund the payments to creditors under the Plan, to fund the reserve for professional fees required by the Plan and fund any reserve for disputed claims. The balance of the funds remaining after the funding of the Plan shall be returned to the Debtor to pay operating expenses of the Debtor from the Effective Date of the Plan through the maturity date of the Exit Loan.

Parties in interest are directed to the attached **Exhibit A** setting forth the *Sources and Uses* of cash under the Plan described in this paragraph.

**Vesting of Assets.** Upon Confirmation, the Debtor shall be authorized to close on the Exit Financing and assume the APS. Upon the Closing, the Property shall vest in the Post-Confirmation Debtor, free and clear of all liens, Claims and encumbrances, subject only to the mortgage granted in favor of the lender pursuant to the Exit Financing. As of the Closing, any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished. Any other assets of the Debtor shall vest in the Post-Confirmation Debtor free and clear of all Liens, Claims and encumbrances.

**Execution of Documents.** (a) Upon entry of the Confirmation Order, the Debtor/Post-Confirmation Debtor and any necessary party thereto, shall execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan.

(b) Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, Debtor/Post-Confirmation Debtor shall be authorized to execute, in the name of any necessary party any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance (including, any Lien, Claim or encumbrance that is to be released and satisfied upon the Debtor's compliance with the provisions of article 4 of the Plan) not expressly preserved in the

Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

**Filing of Documents.**   Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

**Distributions**.   Except as set forth elsewhere in the Plan, all payments required to be made under the Plan shall be made by the Disbursing Agent for disbursement in accordance with the terms of the Plan.

## PRESERVATION OF RIGHTS OF ACTION

The Debtor shall retain, and in accordance with its determination of the best interest of the estate, may enforce any claims, rights and causes of action (i) arising under sections 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

## EXEMPTION FROM TRANSFER TAXES, MORTGAGE RECORDING TAXES, OR SIMILAR TAXES

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan, (including any instrument of transfer executed in furtherance of the sale contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax or similar tax.

## REVOCATION OF THE PLAN

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against the Debtor; or prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

## RETENTION OF JURISDICTION

The Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims and other issues presented by or arising under the interpretation, implementation or enforcement of the Plan, and to determine all other matters pending on the date of confirmation.

# RISK FACTORS

## RISK FACTORS

Although the Debtor believes that it will be able to meet all of the obligations that it is undertaking pursuant to the Plan there can be no assurance that the Closing will occur. Each Creditor and its respective advisers should consider the following factors (and other risks considered elsewhere in this Disclosure Statement).

## CONFIRMATION OF THE PLAN

All distributions to Creditors are contingent on the Plan being confirmed by this Court. Otherwise, the Debtor is not obligated, in any way, to make the payments required hereunder.

## OPERATIONAL/FUNDING RISKS

The Plan as proposed calls for all payments to be made to creditors at Closing or on the Effective Date. Therefore, the operational risks under a plan that provides for payments over time are simply not present in this Plan. Thus, the Debtor does not believe the Plan entails any operational or funding risk regarding payments to creditors. In addition, the monies necessary to pay the carrying costs and pre-developments costs of the Debtor during the year from the Effective Date through the Maturity Date of the Exit Loan have been put in escrow with the Disbursing Agent and will be held by the Debtor subsequent to the Effective Date. Thus the Debtor will have the funds on hand needed to pay its ongoing obligations.

## VOTING INSTRUCTIONS

As noted herein, Claims in Class 1 and Interests in Class 2 are not impaired by the Plan. Accordingly, Holders of Claims in Class 1 and Interests in Class 2 are deemed to have accepted the Plan and votes of holders of Claims in Class 1 and Interests in Class 2 will not be solicited.

## CONFIRMATION OF PLAN

## CONFIRMATION HEARING

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider final approval of the disclosure statement and confirmation of the Plan. **The Confirmation Hearing is scheduled to commence on November 14, 2019, at 10:00 a.m. in the United States Bankruptcy Court, One Bowling Green, New York, New York 10004.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

{01031987.DOC;1 }

**Objections, if any, to final approval of the disclosure statement or confirmation of the Plan shall be filed and served by email so as to be received on or before October 26, 2019 at 5:00 p.m.** Objections must be served upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl, New York, NY 10022, Attn.: A. Mitchell Greene, Esq. (amg@robinsonbrog.com) and Fred B. Ringel (fbr@robinsonbrog.com), and (ii) United States Trustee, 201 Varick Street, Room 1006, New York, New York 10014 Attn: Shannon Scott, Esq. (Shannon.Scott2@usdoj.gov) and filed electronically in accordance with the Court's ECF procedures.

## REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interests" of all Creditors, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.** The so-called "best interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such entity would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code. No class of claims is impaired pursuant to the Plan. The Plan provides for payment in cash in full to all classes of claims.

**Liquidation Analysis.** The Plan provides for payment in full to each class of Allowed Claims. Accordingly, the Debtor believes that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation.

**Feasibility.** For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation is set forth in the Plan. This Plan calls for the Closing on the APS and the transfer of the Property to the Debtor. The Purchase Price and any distributions to creditors will be funded by the proceeds of the Exit Financing and an equity contribution of approximately $4.350 million. The Debtor and its members shall evidence their ability to fund the Purchase Price and any other plan payments at or prior to the confirmation hearing by depositing the funds with the Disbursing Agent. Therefore, Debtor submits there are funds sufficient to satisfy all of the Debtor's Allowed Claims.

After the Closing, the Debtor intends on developing the Property into a two story, 54,000 square foot retail building located on a 27,200 square foot southwest corner lot. The property will have 27,000 square feet of parking space on the roof with 180 parking spaces. The Debtor has estimated it will incur $500,000 in pre-development expenses (or which $50,000 is for contingency). The pre-development budget is needed to obtain drawings and get approvals to demolish two floors of the building to conform top present zoning as well as to design the building for a new retail tenant use. There are no zoning changes or governmental approvals needed to achieve the Debtor's development objectives.

The Debtor does not anticipate generating income from the Property to pay for the carrying costs and development of the Property and therefore the Debtor's members have contributed funds sufficient to pay the costs to develop the Property and fund its carrying costs through the maturity date of the loan. Attached to the Disclosure Statement as **Exhibit A** is a proposed use of funds which sets forth the sums necessary for payment of the Debtor's operations subsequent to the Effective Date until the maturity of the Exit Financing one (1) year from the Effective Date.

Upon the maturity of the Exit Financing, the Debtor intends on refinancing the Exit Financing Loan Documents. Should the Debtor be unable to find refinancing upon maturity of the Exit Financing, the Plan provides that the Property will be turned over to the Exit Lender.

**EFFECT OF CONFIRMATION**

**INJUNCTION**

**(a) Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtor as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtor, from the Properties, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Properties and any property of the Estate that has been or is to be, distributed under the Plan. Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtor, from the Properties or from property of the Estate, any claim, any obligation or debt that was held against the Debtor by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan. The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.**

LIMITATION OF LIABILITY

**To the maximum extent permitted under Section 1125(e) of the Bankruptcy Code, neither the Debtor nor any of its respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan.**

DISCHARGE.

**On the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, only to the extent specified in §1141(d)(1)(A) of the Code, except that the Debtor and the Post-Confirmation Debtor will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in §1141(d)(6)(A); or (iii) of a kind specified in §1141(d)(6)(B).**

### ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court, the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; (b) the formulation, promulgation and confirmation of an alternative plan of reorganization premised upon exit financing, or a sale of the Debtor's contract rights; or (c) dismissal of the Debtor's case.

The Plan proposes payment in full to all classes of claims and therefore the Plan provides a recovery to all Creditors equal to or greater than would be obtainable in a chapter 7 liquidation.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. Federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Claim. Each holder of an Allowed Claim is urged to consult his own tax advisors. This summary does not cover all potential U.S. federal income tax consequences that could possibly arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Allowed Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

The Debtor has not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters nor will the Debtor, with respect to the federal income tax consequences of the Plan, obtain any opinion of counsel. Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. The

{01031987.DOC;1 }

Debtor offers no statements or opinions that are to be relied upon by the creditors as to the treatment of creditors' claims under the Plan.  Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim.

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. Holders of Allowed Claims should consult their own tax advisors as to the Plan's specific federal, state, local and foreign income and other tax consequences.

The tax consequences to Creditor will differ and will depend on factors specific to each Creditor, including but not limited to: (i) whether the Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Claim; (iii) the type of consideration received by the Creditor in exchange for the Claim; (iv) whether the Creditor is a United States person or foreign person for tax purposes; (v) whether the Creditor reports income on the accrual or cash basis method; and (vi) whether the Creditor has taken a bad debt deduction or otherwise recognized loss with respect to a Claim.

**THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH CREDITOR. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.**

**THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH CREDITOR SHOULD SEEK ADVICE BASED UPON THE CREDITOR'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtor's counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, NY 10022, Attn.: A. Mitchell Greene, Esq., (212) 603-6300 or (ii) may be retrieved from the Court's web site at https://ecf.nyeb.uscourts.gov (provided such party has PACER access).

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in this case are on file in the Office of the Clerk of the United States Bankruptcy Court at One Bowling Green, New York, New York 10004, and are available for public inspection Monday

through Friday, between the hours of 9:00 a.m. and 4:30 p.m.

## CONCLUSION

The Debtor believes that the Plan is in the best interests of all Creditors.

Dated:        New York, New York
              November 11, 2019

                                        AAGS HOLDINGS LLC
                                        BY:  GC Realty Advisors, LLC

                                        By:/s/ David Goldwasser
                                        David Goldwasser
                                        Authorized Signatory

                                        ROBINSON BROG LEINWAND GREENE
                                        GENOVESE & GLUCK P.C.
                                        Counsel to the Debtor
                                        875 Third Avenue
                                        New York, New York 10022

                                        By: /s/ A. Mitchell Greene
                                        A. Mitchell Greene

# **EXHIBIT A**

**Assumptions**

| | |
|---|---|
| Acquisition Price | $27,500,000.00 |
| Deposit | $100,000.00 |
| Total Balance | $27,400,000.00 |
| RE Taxes (2019) | $209,835.60 |
| Annual Water Bill | $2,600.00 |
| Estimated Annual Insurance | $20,000.00 |
| Start Date | 9/20/2019 |
| End Date | 11/27/2019 |
| Number of Days | 69 |
| Claims Interest Rate | 1.62% |
| Prime Rate | 4.75% |

| Sources | Amount | % |
|---|---|---|
| Loan Amount | $29,750,000 | 87.24% |
| Churchill Equity | $250,000 | |
| Equity | $4,100,965 | 12.03% |
| **Total Sources** | **$34,100,965** | **100.00%** |

| Uses | Amount | % |
|---|---|---|
| Acquisition Price [1] | $27,500,000 | 80.64% |
| Carry Costs [2] | $275,600 | 0.81% |
| Legal Fees | $150,000 | 0.44% |
| Claims | $595,680 | 1.75% |
| US Trustee Fees | $250,000 | 0.73% |
| Seller (QPS Claims) (Subject to Dispute) | $344,977 | 1.01% |
| *Legal Fees* | *$55,000* | *0.16%* |
| *Water and Taxes prorated for 69 days [3]* | *$40,159* | *0.12%* |
| *Insurance Costs prorated for 69 days [4]* | *$3,781* | *0.01%* |
| *Interest on Use of Cash for 69 days [5]* | *$246,037* | *0.72%* |
| Pre-Development Costs | $500,000 | 1.47% |
| *Legal Fees* | *$125,000* | *0.37%* |
| *Architect* | *$200,000* | *0.59%* |
| *Engineer* | *$125,000* | *0.37%* |
| *Contingency* | *$50,000* | *0.15%* |
| Financing Costs | $4,484,708 | 13.15% |
| **Total Uses** | **$34,100,965** | **100.00%** |

| Senior Loan Sources & Uses | | |
|---|---|---|
| Loan Amount | $29,750,000 | Max loan amount |
| 30-Day LIBOR (as of 10/29/19) | 1.7996% | |
| Loan Interest Rate | 12.00% | The greater of 12% and LIBOR Plus 10% (11.8% as of 10/29/19) |
| Loan Term (Months) | 12 | |
| Monthly DS | $301,632 | |
| Annual DS | $3,619,583 | |
| **Loan Closing Costs** | | |
| Origination Fee | 2.00% | $595,000.00 |
| Legal (Estimate) | | $25,000.00 |
| Application/Processing Fee | | $10,000.00 |
| Prepaid Interest | 12 | $3,619,583.33 |
| Mortgage Recording Tax (BK) | 0.00% | $0.00 |
| Title/Endorsements [6] | 0.75% | $223,125.00 |
| Third Party Reports | | $12,000.00 |
| **Total Closing Costs** | | **$4,484,708.33** |

*1) As of PSA dated July 17th, 2019*
*2) Based on RE Taxes and insurance projections provided by Sponsor ($255,000 annual RE Taxes and $20,000 insurance)*
*3) As per NYC (3 accounts: Acct #00005-20840-001- no balance, budget approx. $1,600. Acct #50005-20841-001- credit balance of $19,437.57. Budget $500. Acct #70005-20839-001- no balance, budget $500).*
*4) As per estimate from our insurance quote*
*5 As per what the net amount due to seller would have been on Sep 27 with an interest rate at Prime*
*6) Calculated as 0.75% of the mortgage amount*

# **EXHIBIT B**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**AAGS HOLDINGS LLC**

ANY SECURITIES CREATED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE OR OTHER JURISDICTION.  THE INTERESTS CREATED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** is made and entered into on this ___ day of November, 2019 (the "Effective Date"), by and among the Company and each Person whose name and signature appears on the signature pages attached hereto, as the Members.

## W I T N E S S E T H :

WHEREAS, on July 3, 2019, AAGS Holdings LLC (the "Company") was duly formed by the filing of Certificate of Formation with the Delaware Secretary of State pursuant to and in accordance with the Limited Liability Company Act of the State of Delaware (the "Act");

WHEREAS, the Company has heretofore entered into that certain Operating Agreement dated as of July 3, 2019 (as same may have been amended and restated from time to time, collectively the "Original Operating Agreement"), pursuant to, and in accordance with the Act;

WHEREAS, the parties hereto desire to, *inter alia,* admit Churchill Member (as hereinafter defined) as a Member of the Company, and (ii) amend and restate in its entirety the Original Operating Agreement in order to set out more fully the respective rights, obligations and duties of the Managing Member and the Members of the Company.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged the parties hereto covenant and agree that the Original Operating Agreement is hereby amended, restated, replaced and superseded in its entirety upon the following terms and conditions.

# ARTICLE I.

## DEFINITIONS

The following terms used in this Amended and Restated Limited Liability Company Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Accountants."  Accountants shall mean any independent accountant (which may include a regional accounting firm) selected by the Managing Member and engaged from time to time by the Company for purposes of (i) preparing and/or providing reports, as provided in Section 11.4; and (ii) performing such other functions as may be set forth in this Agreement or otherwise determined by the Managing Member from time to time in accordance with the terms hereof.

"Act."  Means the Limited Liability Company Act of the State of Delaware as amended, modified or supplemented from time to time (or any corresponding provisions of succeeding law).

"Adjusted Capital Account Deficit."  With respect to each Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable Fiscal Year or other period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provisions of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)    Debit to such Capital Account the items described in paragraphs (4), (5) and (6) of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

"Additional Capital Contributions."  With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.2 of this Agreement.

"Additional Capital Requirement."  As defined in Section 8.2(a) hereof.

"Affiliate."  With respect to any Person, (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, member, managing member, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, member, managing member, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Agreement." Means this Amended and Restated Limited Liability Company Agreement, as the same may be amended from time to time.

2

"Approve," "Approved," or "Approval." Shall refer to a proposed decision, action, report, budget, election, or any other matter that has been proposed by the Managing Member and has received the written approval of the Members with respect to Major Actions and any other action that requires the Members' consent pursuant to the terms of this Agreement.

"Approved Budget." Means the then effective Approved annual budget of the Company (i.e., the then effective annual budget that has been Approved in accordance with Section 5.12 below).

"Approved Financing." Means (A) a loan amount (i) not less than that required to pay off the Churchill Loan and (ii) not more than Thirty Five Million Dollars ($35,000,000), (B) an interest rate not greater than 8%, (C) an origination fee not greater than 1%, (D) an exit fee not greater than 1%, (E) a prepayment premium not more than 6 months from the closing of such financing, (F) a term not less than 12 and not greater than 36 months (inclusive of all extensions), (G) a brokerage fee not greater than 50bps, and (H) non-recourse to members.

"Approved Sale Procedures." Means the procedures governing a Forced Sale as set forth in **Exhibit D** hereof.

"Bankruptcy." Means with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy". A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property or (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days.

"BB Act." As defined in Section17.12 hereof.

"Book Basis." With respect to any asset of the Company, the adjusted basis of such asset for federal income tax purposes. If any asset is contributed to the Company, the initial Book Basis of such asset will equal its fair market value on the date of contribution. If the Book Basis of a Company asset is adjusted pursuant to Section 1.704-1(b) of the Regulations to reflect the

fair market value of such asset, the Book Basis of such asset will be adjusted to equal its respective fair market value as of the time of such adjustment.  The Book Basis of all such assets of the Company will thereafter be adjusted by depreciation as provided in Section 1.704-1(b)(2)(iv)(g) of the Regulations and any other adjustments to the basis of such assets other than depreciation or amortization.

"Business Day." Means any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Capital Account."  A capital account maintained for each Member in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Regulations.  Subject to the foregoing, a Member's Capital Account generally shall be:

(a)      increased by (i) the amount of money contributed by such Member to the Company, including Company liabilities assumed by such Member; and (ii) allocations to such Member of Net Profits (and items thereof) and items of income and gain that are specially allocated to such Member pursuant to Section 10.3; and

(b)      decreased by (i) the amount of money distributed to such Member by the Company, including such Member's individual liabilities assumed by the Company; and (ii) allocations to such Member of Net Losses (and items thereof) and items of deduction or loss specially allocated to such Member pursuant to Section 10.3.

Upon the transfer of an Economic Interest in the Company, the transferee shall succeed to the Capital Account of the transferor with respect to the transferred Economic Interest unless such transfer results in a termination of the Company pursuant to Section 708 of the Code.

"Capital Call Notice."  As defined in Section 8.2(a) hereof.

"Capital Contribution."  With respect to each Member, the amount of cash paid in to the Company by that Member pursuant to Section 8.1 or Section 8.2 of this Agreement.

"Capital Transaction."  Means (i) any transaction pursuant to which the indebtedness secured by any portion of the Property is financed or refinanced; (ii) a sale, condemnation, exchange or casualty, or other disposition, whether by foreclosure or otherwise, of all or substantially all of the Property; or (iii) an insurance recovery or any other transaction, which, in accordance with generally accepted accounting principles, is considered capital in nature.

"Cash From Capital Transactions." Means cash of the Company available for distribution to Members (i) from the sale of the Property or from any other capital or financing transaction, or (ii) received by the Company in connection with (A) any insurance proceeds or condemnation awards or (B) any capital or financing transaction directly involving the Property.  It is understood that Cash From Capital Transactions will be net of any approved expenses of the Company not otherwise paid from Cash From Operations.

"Cash From Operations." Means, for any period, the cash of the Company for such period actually received from all sources, including all cash distributions (or cash equivalents) received by the Company but excluding Capital Contributions and Cash From Capital

Transactions, net of operating expenses of the Company paid in accordance with the Approved Budget and this Agreement.

"Cause." Means with respect to the Managing Member or any Affiliate of the Managing Member, the occurrence of any of the following events: (i) has been found guilty of, or otherwise plead guilty to, engaging in criminal activities constituting a felony, (ii) has engaged in fraud, gross negligence, breach of fiduciary duty, or willful or wanton misconduct with respect of the Company, the Property, or otherwise materially and adversely affecting any Member as confirmed by the Mediator in his sole discretion; provided however, that it will be deemed to be Cause if the Mediator does not make a determination within five  (5) business days after receiving written notice from the party making such allegations, irrespective of when and whether any party responds to same, (iii) had been found liable for, or guilty of, or plead guilty to, fraud, gross negligence, breach of fiduciary duty, or willful or wanton misconduct, other than in conjunction with an Excluded Litigation, (iv) who has brought any suit against Churchill Member, or any Affiliate of Churchill Member, seeking to challenge, invalidate, or otherwise interfere with the Churchill Loan (including, without limitation interposing any defenses thereto); (v) has made, permitted, ratified or otherwise endorsed any payment to any Excluded Person from Company funds without the consent of Churchill Member; (vi) with respect to the DS Member, taking any action under this agreement that requires the consent of the Churchill Member without first obtaining the written consent of the Churchill Member, (vii) with respect to DS Member, prior to the Churchill Payoff Date, the occurrence of any other material breach of or default under a material term or provision of this Agreement that has (or could reasonably be expected to have) a material and adverse effect on the Company or the Property as reasonably determined by the Mediator, provided that, if such material breach is capable of being cured, then DS Member shall have thirty (30) days to cure such material breach to the reasonable satisfaction of the Mediator after written notice (or, if such default is of such a nature that it cannot be cured within thirty (30) days, such longer period as is reasonably necessary to effect such cure, not to exceed a total of ninety (90) days), provided further that, there shall be no notice and cure period applicable under this clause (a) for the same material breach; (b) an event of Bankruptcy with respect to the Company, DS Member or an Affiliate of DS Member; (c) any Company default under the Churchill Loan which is not cured by the Company within any applicable notice, grace or cure period; or (d) a Disqualification of DS Member as Managing Member, provided that DS Member is not replaced with a successor managing member within thirty (30) days of such Disqualification with a Person selected by DS Member and reasonably satisfactory to Churchill Member.

"Certificate of Formation." Means the Certificate of Formation of AAGS Holdings LLC, as filed with the Secretary of State of the State of Delaware on July 3, 2019, as the same may be amended or restated from time to time.

"Churchill Loan."    Means that certain $29,750,000 Exit Loan facility made by CHURCHILL to the Company as of November 13, 2019.

"Churchill Loan Documents." Means any and all documents, instruments and agreements which evidence and/or secure the Churchill Loan, same as may be amended, restated, renewed and/or modified, from time to time.

"Churchill Member."  Churchill-SP QPS LLC, a New York limited liability company, and as used herein, means to include any members of Churchill Member, and all Affiliates thereof.

"Churchill Payoff." Means the complete repayment and satisfaction in full of any and all obligations of the borrower under the Churchill Loan Documents, including, without limitation, the payment in full of any and all accrued and unpaid interest, unpaid principal, fees, costs, charges and other amounts as may be then due and owing under the Churchill Loan Documents.

"Churchill Payoff Date." Means the date on which the Churchill Payoff is completed in full.

"Code."  The Internal Revenue Code of 1986 as it may be amended from time to time, or any provision of succeeding law.

"Co-Managing Member."  Means Churchill Member and any successor to Churchill Member.

"Company." As defined in the Recitals hereof.

"Company Minimum Gain."  Partnership minimum gain as defined in Section 1.704-2(d) of the Regulations.  Subject to the foregoing, Company Minimum Gain shall equal the amount of gain, if any, which would be recognized by the Company with respect to each Nonrecourse Liability of the Company if the Company were to transfer the Company's property that is subject to such Nonrecourse Liability in full satisfaction thereof.

"Company Representative." As defined in Section 17.12 hereof.

"Control," "Controlled by," and "under common Control with."  Means possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the Person in question (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Deadlock." As defined in section 13.1 hereof.

"Defaulting Member."  As defined in Section 8.2(b) hereof.

"Disqualification." Means, with respect to Managing Member, the death (or, in the case of a corporation or other organization, dissolution or liquidation), Bankruptcy, resignation, or removal of such Managing Member.

"DS Member." Means DS Partners LIC LLC, a Delaware limited liability company.

"Due Date."  As defined in Section 8.2(b) hereof.

"Economic Interest."  A Member's share of one or more of the Company's Net Profits, Net Losses and rights to distributions of the Company's assets pursuant to this Agreement and

the Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members.

"Effective Date."  As defined in the first paragraph of this Agreement.

"Entity."  A general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Excluded Litigation." Means any of those pending litigations set forth on the Annexed **Exhibit C**.

"Excluded Persons." Means Brad Zackson and any Affiliate of Brad Zackson.

"Exercising Member." As defined in Section 13.2 hereof.

"Existing Guarantee." As defined in Section 5.9.1 hereof.

"FAR." Means floor area ratio with respect to the Property as determined unanimously by both Members.

"Financing." Means any (i) mortgage loan that encumbers all or any portion of the Property, (ii) any mezzanine loan to which the Company or any Subsidiary is a party or (iii) preferred equity to the Company or any subsidiary of the Company.

"Fiscal Year."  The Company's fiscal year, which shall be the calendar year.

"Forced Sale." As defined in Section 13.3 hereof.

"Forced Sale Notice." As defined in Section 13.2 hereof.

 "Initial Capital Contribution."  The initial contribution to the capital of the Company made by a Member pursuant to Section 8.1 of this Agreement.

"Initial Property Budget." As defined in Section 5.12 hereof.

"Interest."  Any interest in the Company, including a Membership Interest, an Economic Interest, any right to vote or participate in the business of the Company, or any other interest in the Company.

"Liquidating Events." As defined in Section 14.1(a) hereof.

"Liquidator."  Means the Managing Member, provided that if either (i) a Bankruptcy has occurred with respect to the Managing Member, (ii) there is no remaining Managing Member, (iii) there is a default by the Company under the [Churchill Loan] or other financing of the Company, or (iv) the [Churchill Payoff] has not occurred, as the case may be, then a "Liquidator" shall be appointed by Churchill Member.

"Managing Member." As defined in Section 5.2 hereof.

"Mediation." Means non-binding mediation to be held in a mutually agreed upon location in New York City, New York before the Mediator. The costs of any mediation to be split equally among the parties.

"Mediator." Means Andrew W. Albstein, Esq., or if Andrew W. Albstein, Esq. has a good faith basis to refuse to serve as mediator for a given dispute which he is asked to oversee in connection with this Agreement, an independent mediator shall be appointed by JAMS in accordance with its rules; provided that such mediator shall have not less than twenty (20) years of experience with commercial real estate and joint ventures in the New York City metropolitan area.

"Member." Each Person who executes this Agreement or a counterpart thereof as a Member, and each of the Persons who may hereafter become Members as provided in this Agreement; provided however, that no Person may be a Member if any Excluded Persons are in any way affiliated with the Member.

"Member Minimum Gain." Means partner minimum gain as defined in Section 1.704-2(g) of the Regulations. Subject to the foregoing, Member Minimum Gain shall equal the amount of gain, if any, which would be recognized by a Member if the Member Nonrecourse Debt of such Member were treated as a Nonrecourse Liability and the property which is subject to such deemed Nonrecourse Liability were transferred in full satisfaction thereof.

"Member Nonrecourse Debt." Means partner nonrecourse debt as defined in Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Deductions." Means partner nonrecourse deductions as defined in Section 1.704-2(i) of the Regulations. Subject to the foregoing, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year shall equal the excess, if any, of the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during that Fiscal Year over the aggregate amount of any distribution during that Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i) of the Regulations.

"Membership Interest." A Member's entire interest in the Company including such Member's Economic Interest and any right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement or the Act.

"Net Profits" and "Net Losses." For each Fiscal Year or other period, an amount equal to the Company's taxable loss or income, respectively, for such year or period, determined in accordance with Section 703(a) of the Code (and for this purpose, all items of income, gain, loss, or reduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)    In the event the Book Basis of any Company asset is adjusted in compliance with Regulation Section 1.704-1(b), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(iv)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Basis of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Book Basis;

(v)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, whenever the Book Basis of an asset differs from its adjusted basis for federal income tax purposes at the beginning of a Fiscal Year, depreciation, amortization or other cost recovery deductions allowable with respect to an asset shall be an amount which bears the same ratio to such beginning Book Basis as the federal income tax depreciation, amortization or other cost recovery deduction for such year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income taxes of an asset at the beginning of a year is zero, depreciation, amortization or other cost recovery deductions shall be determined by reference to the beginning Book Basis of such asset using any reasonable method selected by the Managing Member;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interests, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

(vii)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 10.3 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

"New Allocations." As defined in Section 10.7 hereof.

"Non-Defaulting Member."  As defined in Section 8.2(b) hereof.

9

"Nonrecourse Deductions."  As defined in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations.  Subject to the preceding sentence, the amount of Nonrecourse Deductions for a Fiscal Year shall equal the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that Fiscal Year (determined under Section 1.704-2(d) of the Regulations) over the aggregate amount of any distributions during that Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain (determined under Section 1.704-2(h) of the Regulations).

"Nonrecourse Liability."  As defined in Section 1.704-2(b)(3) of the Regulations.

"New Allocations."  As defined in Section 10.7 hereof.

"Officer."  An individual appointed by the Managing Member to whom the Managing Member delegates specified responsibilities.  The Managing Member may, but shall not be required to, create such offices as it deems appropriate, including, but not limited to, Chief Executive Officer, President, Executive Vice President, Senior Vice President(s), Vice President(s), Secretary and Treasurer. The Officers shall have such duties as are assigned to them by the Managing Member from time to time.  All Officers shall serve at the pleasure of the Managing Member and the Managing Member may remove any Officer from office without cause and any Officer may resign at any time.

"Original Operating Agreement."  As defined in the Recitals hereof.

"Percentage Interest."  Each Member shall have a Percentage Interest as set forth on Exhibit "A" attached hereto and incorporated herein.

"Permitted Upzoning."  Means upzoning of the Property that would (i) increase the FAR for the Property to not less than 12.0, (ii) permit not less than 200,000 ZFA of retail and/or office space to be constructed on the Property, and (iii) not require any further obligations on site or off site including, but not limited to, community facilities, community parks, public plazas, public entitlements, transit improvements or other similar obligations and appurtenances to the Property.

"Person" or "person." Means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Property."  Means that certain real property known as 23-10 Queens Plaza South, Queens, New York.

"Regulations."  Means the federal income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Regulatory Allocations." As defined in Section 10.3(f) hereof.

"Removed Managing Member." As defined in Section 5.9.1 hereof.

10

"Reserves."  Funds set aside and amounts allocated to reserves in amounts determined by the Managing Members for working capital and the payment of taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Silverpoint Entity."  Means SPCP Group III LOPD 33 LLC, a Delaware limited liability company.

"Special Allocations."  As defined in Section 10.3 hereof.

"Subsidiary."  Means any Person which is Controlled, directly or indirectly, by the Company, through which the Company shall hold an interest, whether directly or indirectly (including, without limitation, any interests in a limited liability company) in any asset, including, but not limited to, the Property.

"Target Amount."  As defined in Section 10.2(c) hereof.

"Transfer."  As defined in Section 12.1 hereof.

"Upzoning Completion." Means a final and unappealable, written decision by the applicable governmental or quasi-governmental agency having jurisdiction over the Property (or reasonable but conclusive written proof of such a decision thereby) to enact the Permitted Upzoning.

## ARTICLE II.

## FORMATION OF COMPANY

2.1.    Formation.  On July 3, 2019, the Company was formed as a Delaware limited liability company in accordance with the provisions of the Act.  The Managing Member shall cause the company to be authorized to do business in the State of New York pursuant to the New York Limited Liability Company Law.

2.2.    Name.  The name of the Company is AAGS Holdings LLC.

2.3.    Principal Place of Business.  The principal place of business of the Company shall be 23-10 Queens Plaza South, Long Island City, New York, or at such other place in New York, New York as the Managing Member, upon prior written notice to the Members, may from time to time determine.

2.4.    Registered Office and Registered Agent.  The Company's registered office shall be at the Company's principal place of business and the registered agent shall be as set by the Managing Member, as may be changed from time to time pursuant to the Act and the applicable rules promulgated thereunder.

2.5.    Term.  The term of the Company commenced on July 3, 2019 and shall continue until the Company is dissolved and its affairs wound up in accordance with the provisions of this Agreement or the Act.

## ARTICLE III.

### BUSINESS OF COMPANY

3.1.    Purpose of the Company. Subject to the provisions of this Agreement, the purposes of the Company are solely the following:

(a)    to own (indirectly though one hundred percent (100%) owned Subsidiaries), one hundred percent (100%) of the fee interest in the Property, and to manage develop, lease and operate the Property;

(b)    to do any and all other acts or things that may be necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the business of the Company as set forth in Section 3.1(a); and

(c)    to exercise all powers necessary to or reasonably connected with the foregoing which may be legally exercised by limited liability companies under the Act.

The Company shall not conduct any other business or engage in any other activities, except as expressly permitted by this Section 3.1, without the prior written approval of Churchill Member.

3.2.    Powers of the Company.  The Company will have the power, in fulfilling the purpose set forth above, to conduct any business or take any action which is lawful and which is not prohibited by the Act.

## ARTICLE IV.

### NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are set out on Exhibit "A" attached hereto and incorporated herein.

## ARTICLE V.

### RIGHTS AND DUTIES OF MANAGING MEMBER

5.1.    Management.  The business and affairs of the Company shall be managed by its Managing Member.  The Managing Member shall have responsibility and discretion in the management and control of the business and affairs of the Company for the purposes herein stated, shall make decisions affecting the Company's affairs and business, and shall have full, complete and exclusive discretion to take any and all action that the Company is authorized to take and to make all decisions with respect thereto, all subject to the rights of the Members as set

forth in this Agreement.  The Managing Member shall discharge its duties with respect to the finances of the Company, including, without limitation, all duties concerning the collection, maintenance and application of any and all funds provided to or obtained by the Company from any source whatsoever in a fiduciary capacity in accordance with the Act and in good faith, in the manner it reasonably believes to be in the best interest of the Company giving due regard to the authority and restrictions on authority granted to Managing Member hereunder. The Managing Member shall not knowingly or intentionally cause or allow the Company to violate applicable State or Federal laws. The Managing Member shall not be entitled to any compensation for acting as Managing Member of the Company except as expressly set forth in this Agreement.

5.2.    <u>Number, Tenure and Qualifications</u>.  The Company shall initially have one (1) Managing Member.  The Members hereby initially appoint DS Member as the Managing Member.  The Managing Member shall serve as a Managing Member until the earlier of (i) its resignation in accordance with Section 5.9 of this Agreement, (ii) its Disqualification or (iii) the occurrence of an event constituting Cause.  Notwithstanding anything to the contrary in this Agreement, the Members consent and agree that on and after the Churchill Payoff Date, (a) Churchill Member shall automatically become Co-Managing Member of the Company with DS Member (in its capacity as Managing Member) without the need for any further action, (b) all references to "Managing Member" in this Agreement shall refer to DS Member and Churchill Member, subject to the subsequent the Disqualification, removal or Resignation of either such party as Managing Member in accordance with the terms of this Agreement, and (c) there shall thereafter be two (2) Managing Members of the Company, subject to the subsequent the Disqualification, Removal or Resignation of either such party as Managing Member in accordance with the terms of this Agreement.  From and after the Churchill Payoff Date, any and all decisions affecting the Company and the Property, and all business affairs of the Company (including, without limitation, the exercise of those powers under Article III and Section 5.1 hereof, as limited by Section 5.3, hereof) shall be jointly managed by Churchill Member and DS Member in accordance with the provisions of this Agreement, and all acts and decisions to be made and undertaken by or on behalf of the Company shall be made or undertaken jointly with the consent of both Churchill Member and DS Member, with any Deadlock resolved as set forth in Article XIII, herein.

5.3.    <u>Certain Powers of the Managing Member</u>.

Subject to Section 5.4 of this Agreement, the Managing Member shall have the sole and exclusive right to manage the business of the Company and shall have all of the rights and powers which may be possessed by a Managing Member under the Act including, without limitation, the right and power to:

(a)    acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)    operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage and lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Company;

13

(c)    execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with management, maintenance and operation of the Company, or in connection with managing the affairs of the Company, including executing amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement, pursuant to any power of attorney granted by the Members to the Managing Member, provided however, that the Managing Member shall not enter into (and shall not cause the Company to enter into), whether directly or indirectly, any agreements with any Excluded Persons;

(d)    care for and distribute funds to the Members by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement; provided, however, that no funds may be distributed to, or on account of, any Excluded Persons;

(e)    contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company, provided that the total compensation to be paid by the Company under any such agreement does not exceed $50,000.00;

(f)    engage in any kind of activity and perform and carry out contracts of any kind necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, including but not limited to upzoning the Property, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Company is then formed or qualified;

(g)    take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company; and

(h)    institute, prosecute, defend, settle, compromise and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

For the avoidance of doubt, from and after the Churchill Payoff Date, the exercise of any and all rights and powers of the Managing Member under this Section 5.3 shall require the unanimous consent and approval of Churchill Member and DS Member, and if such unanimous consent and approval is not obtained, the parties shall follow the process set forth in Section 13, hereof.

5.4.    <u>Actions Requiring Unanimous Member Consent</u>.  Notwithstanding anything in this Agreement to the contrary, prior to the Churchill Payoff Date (after which all decisions will be made jointly by Churchill Member and DS Member) the written approval of both Members (which approval may be provided by eletronic mail) shall be requried before the Company (or the Managing Member, as appropriate) shall take any of the following actions (each, a "Major Action"):

(a)    to cause or approve any sale, transfer or other disposition of the Property, other than an Forced Sale;

(b)    to make any change to the stated purposes of the Company set forth in Section 2.3 hereof, or conduct any activities on behalf of the Company other than in accordance with the Company's stated purposes;

(c)    to issue any additional Membership Interests or other equity interests in the Company other than what was initially listed in Exhibit A;

(d)    to cause the Company to enter into any agreements with the Managing Member regarding property or asset management other than as provided in this Agreement;

(e)    subject to Section 5.12 of this Agreement, to approve or authorize any unbudgeted expenditures once the aggregate of all unbudgeted expenditures exceeds $5,000;

(f)    the acquisition by the Company of any material asset other than the Property and personal property relating to the Property in the ordinary course of business;

(g)    the Company's acceptance or entering into of any finanancing, loan and the mortgaging, pledging or encumbering of any interest in or material asset of the Company as security therefor, in each case other than the Churchill Loan on the date hereof or an Approved Financing;

(h)    the entering into (including the approval of the terms and conditions), amendment, modification, alteration, change, assignment, extension, termination or cancellation of, or the waiver of any rights under, any agreement between the Company  and an Affiliate of Managing Member;

(i)    at any time prior to the Churchill Payoff Date, the institution or settlement of any lawsuit, claim, counterclaim or other legal proceeding (pending or threatened) by or against the Company where the maximum amount claimed by or against the Company exceeds $10,000.00, including confessing a judgment against it or accepting the settlement, compromise or payment of any claim asserted against the Company or its properties and assets (including claims covered by the policies of insurance maintained by the Company), or asserted by the Company in respect of the foregoing;

(j)    filing a petition for relief under the Bankruptcy Code, as amended, with respect to the Company; causing, acquiescing or consenting to any Bankruptcy; making an assignment for the benefit of creditors, applying for the appointment of a custodian, receiver or trustee for the Company or any of its assets; consenting to any other bankruptcy or similar proceeding, consenting to the filing of such proceeding or admitting in writing the Company's, inability to pay its debts generally as they become due; or engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, or omit to take any action which causes the dissolution, liquidation or winding-up of the Company or the Managing Member,

(k)     making any significant accounting decision for the Company which may, or is likely to, have an adverse effect on Churchill Member or its Interests (as reasonably determined by Churchill Member in good faith);

(l)     amend, modify, waive or terminate, this operating agreement or similar constituent documents of the Company other than in connection with any Transfers or issuances of Membership Interests made in accordance with this Agreement;

(m)     issuing guaranties on behalf of the Company of obligations of any other Person, including guaranties of any of the obligations of any Affiliate of any Member, other than as required pursuant to the Churchill Loan on the date hereof or in connection with an Approved Finanancing;

(n)     any merger or consolidation of the Company with or into any other entity or Person;

(o)     issuing any interest or equity in the Company, or approving the admission to the Company of a successor or an additional Member or remove any Member, except in accordance with the terms of this Agreement;

(p)     the submission of any application or other documents regarding the FAR, any entitlements, zoning and uses of all or any portion of the Property, provided that DS Member may take actions in furtherance of appliacions and other matters set forth in this Seection 5.4(p) without the consent or cooperation of Churchill Member solely to the extent necessary to effect the Permitted Upzoning.  Notwithstanding anything herein to the contrary, the Churchill Member or its designee, shall attend each and any meeting with any official of the City of New York or the State of New York in connection with any Permitted Upzoning, or any other zoning or land-use related issues affecting the Property.

(q)     enter into, negotiate, or execute any lease, agreement to market, or quote to any prospective lessee or licensee any rental value for any portion of the Property;

(r)     opening any bank account; and/or

(s)     enter into any agreement or otherwise make a binding commitment to do any of the foregoing.

5.5.    <u>Liability for Certain Acts</u>.  Managing Member shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except for loss or damage resulting from (a) fraud, (b) intentional misconduct or knowing violation of law or (c) a transaction for which such Managing Member received a personal benefit in violation or breach of the provisions of this Agreement.  The Managing Member shall be entitled to rely on information, opinions, reports or statements, including but not limited to financial statements or other financial data prepared or presented by: (i) any one or more Members, the Managing Member, Officers or employees of the Company whom the Managing Member reasonably believes to be reliable and competent in the matter presented, or (ii) legal counsel, public accountants, or other persons as to matters the Managing Member reasonably believes are within the person's professional or expert competence.

16

5.6.    <u>Managing Member Has No Exclusive Duty to Company</u>.  The Managing Member shall not be required to manage the Company as the Managing Member's sole and exclusive function and the Managing Member may have other business interests and may engage in other activities in addition to those relating to the Company even if such additional business interests and activities are competitive with the Company.  Except as set forth herein, neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of other any other Member or to the income or proceeds derived therefrom.  The Members shall incur no liability to the Company or to any of the other Members as a result of engaging in any other business or ventures.

5.7.    <u>Bank Accounts</u>.  Subject to Section 5.4 of this Agreement, the Managing Member may from time to time open bank accounts in the name of the Company; provided that, at all relevant times, DS Member and Churchill Member shall each be signatories thereon, and signatures from both DS Member and Churchill Member shall be required in connection with any action taken with respect to any such account(s).  DS Member designates Gary Segal as its authorized signatory with respect to such bank accounts, and Churchill Member designates Sorabh Maheshwari as its authorized signatory with respect to such bank accounts. Notwithstanding anything herein to the contrary, at the time the initial operating account for the Company is opened under this section 5.7, DS Member shall deposit no less than five hundred thousand dollars ($500,000) into such account to fund predevelopment costs in accordance with the Approved Budget.

5.8.    <u>Indemnification</u>.  To the fullest extent permitted by the Act, the Company shall indemnify each Managing Member and each Member, and make advances for expenses to each Managing Member (as reasonably determined by DS Member and Churchill Member) and each Member arising from any actual loss, out of pocket cost or expense, actual damage, claim or demand, in connection with the Company and any Member's status as a Managing Member, the Managing Member's or any Member's participation in the management, business and affairs of the Company or such Managing Member's or such Member's activities on behalf of the Company.  To the fullest extent permitted by the Act, the Company shall also indemnify its Officers, employees and other agents who are not a Managing Member or Members arising from any actual loss, out of pocket cost or expense, actual damage, claim or demand in connection with the Company, any such Person's participation in the business and affairs of the Company or such Person's activities on behalf of the Company.  For the avoidance of doubt, no Person shall be indemnified in accordance with this Section 5.8 for any loss or damage resulting from such Person's intentional misconduct, gross negligence, willful malfeasance, knowing violation of law or from any transaction for which such Person received a personal benefit in violation or breach of the provisions of this Agreement.

5.9.    <u>Resignation or Removal</u>.

5.9.1    Any Managing Member may resign at any time by giving not less than thirty (30) days' prior written notice to the Company and each Member.  The resignation of any Managing Member shall take effect at such time as is specified in such notice of resignation; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.9.2    A Managing Member may be removed for Cause (a "Removed Managing Member") on five (5) business days' notice following delivery of a notice from the Member seeking removal setting forth the basis for the Cause for removal.

5.9.3    After the death or incapacity of Gary Segal, DS Member shall have fifteen (15) days to select a replacement manager of DS Member for Gary Segal; provided however, that if such replacement is not acceptable to Churchill Member, in its sole but reasonable discretion, it shall be deemed a Deadlock (without the need to proceed to Mediation in accordance with Section 13 below).

5.9.4    The resignation or termination of a Managing Member, shall not affect its rights as a Member, if any, and shall not constitute a withdrawal of the Managing Member as a Member; provided, however, that notwithstanding anything to the contrary contained herein, the former Managing Member shall have no further rights as the "Managing Member" under this Agreement.  Upon the resignation of the of DS Member as the Managing Member or its termination for Cause pursuant to the terms hereof, (x) in the case of a resignation by, or termination for Cause of, DS Member, Churchill Member shall become or shall be deemed to be the sole Managing Member, as the case may be, and (y) in the case of a resignation by, or termination for Cause of, Churchill Member, DS Member shall become or be deemed to be the sole Managing Member.

5.10.    <u>Compensation and Reimbursement</u>.  Except for the reimbursement of any actual out-of-pocket expenses incurred by the Managing Member in accordance with the then Approved Budget, no Member, Managing Member or Affiliate thereof shall be entitled to any compensation or reimbursement from the Company.

5.11.    <u>No Breach of Managing Member Obligations</u>.  The Managing Member shall not be in breach of its duties and obligations under this Agreement if its failure to perform is due to a lack of Company funds necessary to fulfill such duties and obligations, or the result of the breach of the duties and obligations of the other Members' under this Agreement.  The other Members acknowledge that the Managing Member shall have no obligation to advance funds to the Company in order to perform its duties and obligations under this Agreement which was not approved by the other Members.

5.12.    <u>Operating Budgets</u>.  Attached hereto as <u>Schedule 5.12</u> is the Approved budget for the Property for the current Fiscal Year of the Company (such budget, as modified from time to time in accordance with the provisions of this Agreement, the "<u>Initial Property Budget</u>").

(a)    For each Fiscal Year after the Fiscal Year to which the Initial Property Budget pertains, the Managing Member, by no later than November 1st of the prior Fiscal Year, shall prepare and submit to the Members for its approval a proposed annual budget for the Company and the Property for such Fiscal Year (containing (x) reasonable detail and covering both anticipated operating costs and anticipated capital expenditures on a line-item basis and (y) a business plan for the Company for the upcoming Fiscal Year).

(b)    Within 30 days after receipt by the Members of a proposed annual budget (or such longer period as the Members may reasonably request on notice to the Managing

Member), the members shall advise the Managing Member as to whether the Members approve or disapprove such proposed annual budget. If, with respect to any proposed annual budget, the Members fail to so advise the Managing Member within such time period, then the Members shall be deemed to have rejected such proposed annual budget.

(c)    If any Member objects to any aspect of a proposed annual budget, then the Managing Member, within ten (10) days after its receipt of such objection, shall (x) revise such proposed annual budget to address and incorporate all of the Member's objections and (y) re-submit the same to the Members for approval (in which case, all of the provisions of the immediately preceding clause (b) shall apply to such re-submission). The foregoing provisions of this Section 5.12(d) shall be repeated until there is an Approved Budget for the Fiscal Year in question.

(d)    If, as the first day of any Fiscal Year, there does not yet exist an Approved Budget for such Fiscal Year, then, until such Approved Budget shall exist, (i) the Approved Budget for the immediately preceding Fiscal Year (other than any non-recurring or discretionary expenditures set forth in such Approved Budget) shall remain in effect and shall automatically be deemed adjusted to reflect actual increases in real estate taxes, insurance premiums and utilities expenses for the relevant period and (ii) accordingly, the Managing Member may incur, in respect of such Fiscal Year, any expenditures expressly contemplated by such Approved Budget for such prior Fiscal Year as so adjusted, other than any non-recurring or discretionary expenditures set forth in such Approved Budget (it being understood, however, that nothing in this clause (ii) shall restrict the right of the Managing Member to send a Capital Call Notice pursuant to Section 8.2 below).

(e)    For the avoidance of doubt, the Managing Member (without the further approval of the Members) is entitled to make all expenditures set forth in the then Approved Budget; provided, however, that subject to the provisions of Section 5.4(e), the Managing Member shall not (without the Members' prior written consent in each instance) expend, or obligate the Company to expend, any sums that would, individually or in the aggregate, cause any line item in such Approved Budget to be exceeded. The Managing Member shall notify the Members of any material line item variances in any Approved Budget in excess of those set forth in Section 5.4(e) (which notification shall contain a reasonably-detailed explanation as to why such variances occurred). The Managing Member shall not modify any Approved Budget without the Members' prior written consent in each instance.

(f)    Notwithstanding anything herein to the contrary, no funds shall be paid to or on account of any Excluded Persons, regardless of whether there is any provision in the Approved Budget for same; provided that nothing herein shall prevent the payment of funds to any bona fide third-party vendor or consultant (a "Contracting Vendor") that contracts with or otherwise pays monies to any Excluded Person in connection with services rendered (directly or indirectly) for the Company or to the Property, provided that where payment is made by the Company to a Contracting Vendor, (i) the Contracting Vendor must certify in writing that no Excluded Person owns any membership interest (directly or indirectly) in such Contracting Vendor, and (ii) each of (x) the Contracting Vendor, (y) the DS Member, and (z) the Excluded Member that has been engaged by the Contracting Vendor, must provide an indemnity to the

Company for all costs, including reasonable attorney's fees, incurred by the Company related to any litigation with the Excluded Member.

5.13.  <u>Subsidiaries</u>.  All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of each Subsidiary, whether any such Subsidiary is managed or controlled directly or indirectly by the Company, as member, manager, partner, stockholder or otherwise.  Any action to be taken by any of the Subsidiaries shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional rights and limitations granted or imposed in the governing documents of such Subsidiary.  Any and all references herein to the Company or any Managing Member or Member causing or directing any action on behalf of a Subsidiary shall be deemed to refer to the Company causing (or such Managing Member or Member causing the Company to cause), in its capacity as the sole member of such Subsidiary, such action to be taken for and on behalf of such Subsidiary.  In the event that the Company conducts its business through one or more Subsidiaries, the Managing Member shall perform, with no additional compensation, the same or substantially identical services for each such Subsidiary as the Managing Member performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement and provided that if and to the extent any one or more of the Managing Member's services are to be performed by a third-party property manager pursuant to a property management agreement, then such property manager shall perform the same.  The Managing Member agrees to perform such duties, and in such circumstances and with regard to such duties, the Managing Member shall be subject to the same standards of conduct and shall have the same duties and obligations in performing or such services on behalf of each such Subsidiary as are set forth in this Agreement.  Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of a Subsidiary that, if taken or made by or on behalf of the Company (a) would constitute a Major Action, will require Approval in accordance with this Agreement and (b) would otherwise require the direction or approval of one or more Members under this Agreement, will require the direction or approval of the same.

## ARTICLE VI.

## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1.  <u>No Management by Members</u>.  Except as provided in this Agreement and for non-waivable provisions of the Act, the Members, in their capacities as Members, shall have no right to, and shall not, bind the Company, take part in the management or control of the Company's business or vote on any matter relating to the Company's business.  The Members, any Affiliate thereof, or an employee, stockholder, agent, director or officer of a Member or any Affiliate thereof, may be an employee or agent of the Company if so appointed by the Managing Member.  The existence of these relationships and acting in such capacities will not result in such Members being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Members.  For avoidance of doubt, if DS Member acts in its capacity as Managing Member to seek approval or consent of the Members, it shall be deemed to have consented to such proposed action or decision in its capacity as a Member.

6.2.    <u>Limitation on Liability</u>.   Except as otherwise set forth herein, each Member's liability shall be limited as set forth in the Act.  Other than with respect to DS Member's obligations relating to the Churchill Loan, no Managing Member shall be required in any way whatsoever to directly or indirectly guaranty any loans or other debts of the Company or provide indemnities in connection with any other actual or potential liabilities of the Company.

6.3.    <u>No Liability for Company Obligations</u>.   No Member will have any personal liability for any debts or losses of the Company (other than debts for which the Member agreed to be personally liable).

6.4.    <u>List of Members</u>.   Upon written request of any Member, the Company shall provide a list showing the names, addresses and Membership Interests and Economic Interests of all Members and the other information required by the Act.

## ARTICLE VII.

## <u>MEETINGS OF MEMBERS</u>

7.1.    Meetings of the Members may be called by any Member.  The call shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than ten (10) Business Days or more than thirty (30) days prior to the date of such meeting.  Members may vote in person or by proxy at such meeting.  Whenever the vote or consent of a Member is permitted or required under this Agreement, such vote or consent may be given at a meeting of the Members or may be given in accordance with the procedure prescribed in Section 7.5.

7.2.    For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Managing Member may fix, in advance, a date as the record date for any such determination.  Such date shall not be more than thirty (30) days or less than ten (10) Business Days before any such meeting.

7.3.    Each  Member may authorize any Person or Persons to act for him by proxy on all matters in which the  Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Member or his attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the  Member executing it.

7.4.    Each meeting of the Members shall be conducted by the Managing Member or such other Person as the Managing Member may appoint pursuant to such rules for the conduct of the meeting as the Managing Member or such other Person reasonably deems appropriate.

7.5.    Whenever the Members of the Company are required or permitted pursuant to this Agreement to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken shall be signed by all of the Members.

## ARTICLE VIII.

## CONTRIBUTIONS TO THE COMPANY

8.1.    Initial Capital Contributions.

Upon the execution of this Agreement, the Members shall contribute cash to the Company in the amounts set forth next to such Members' names on Exhibit "A" hereto as their Initial Capital Contributions.  DS Member acknowledges and agrees that Chuchill Member's Interest is not based solely on its initial contribution of cash to the Company but also for other good and valuable consideration provided to the Company including, without limitation, the procuring of the Churchill Loan for the Company.  For avoidance of doubt, notwithstanding anything to the contrary contained in this Agreement, while the Churchill Loan is outstanding, no additional Capital Contributions made by DS Member prior to the repayment in full of the Churchill Loan shall increase DS Member's Percentage Interest or decrease Churchill Member's Percentage Interest in the Company.

DS Member shall, as an initial capital contribution, contribute, or agree to contribute, funds sufficient to satisfy amounts in the Approved Budget relating to (i) interest on the Churchill Loan, (ii) any carry costs relating to the Property, including but not limited to taxes and insurance, and (iii) all costs relating to the upzoning of the Property.

8.2.    Additional Capital Contributions.

(a)    Capital Calls.  From and after the Churchill Payoff Date, if the Managing Member determines that the Company does not have sufficient funds to pay its expenses, or will be in need of such additional capital within ninety (90) days thereof, and for the avoidance of doubt after agreement by each Managing Member (as applicable), the Managing Member shall send a notice (a "Capital Call Notice") to each Member setting forth (i) the amount of the total capital call ("Additional Capital Requirement"), (ii) the purposes for which the funds will be used, and (iii) such Member's pro rata share of such Additional Capital Requirement, such pro rata share being equal to the Additional Capital Requirement multiplied by such Member's Percentage Interest. Each Member shall contribute in cash such Member's pro rata share of the Additional Capital Requirement within fifteen (15) days following receipt of the Capital Call Notice, provided that the remedies specified below in this Section 8.2 shall constitute the sole remedies in the event any Member fails to contribute its required Additional Capital Contribution.  Notwithstanding the foregoing, prior to the Churchill Payoff: (w) Churchill Member shall not be required to contribute any additional capital to the Company, (x) no loans shall be made by any Member to the Company, (y) DS Member shall be obligated to contribute additional capital to the Company as required for the Company to meet its obligations set forth on the Approved Budget, to pay all amounts due under the Churchill Loan, and cover all costs associated with the rezoning efforts, and (z) Churchill Member's Percentage Interest is not subject to dilution due to the fact that it is not required to make any additional capital contributions prior to the Churchill Payoff Date. Notwithstanding anything in this Agreement to the contrary, at all relevant times prior to the Churchill Payoff Date, the Managing Member may send a Capital Call Notice to the Members not more than once per month, if at all, and only in accordance with the then Approved Budget.

(b)    Member Loans.  If at any time or times after the Churchill Payoff, either (i) the Managing Members determine to make Member loans to the Company or (ii) a Capital Call Notice was sent to the Members and any Member shall fail to timely make any Additional Capital Contribution to the Company within the specified time as required pursuant to Section 8.2(a) hereof and such failure shall continue for a period of thirty (30) days after notice from the Managing Member, the following provisions shall apply.  In the case of a defaulting Member (the "Defaulting Member") under a Capital Call Notice, one or more of the other Members (*i.e.*, other than the Defaulting Member) (the "Non-Defaulting Members") may, at their option loan to the Company all or any portion of the Defaulting Member's required Additional Capital Contribution and loan all or any portion of the Non-Defaulting Member's required Additional Capital Contribution, in either case in lieu of making such Additional Capital Contribution.  All Member loans, whether pursuant to the initial election of the Managing Members or due to a Defaulting Member, shall be due and payable to the Company upon repayment of the same, together with interest, out of distributions otherwise due to such Members advancing the loans in accordance with Section 9.1 below (the "Due Date"), and shall bear interest on the unpaid principal amount thereof from time to time remaining, from the date advanced until repaid, at an interest rate equal to the lesser of: (A) 24%; or (B) the maximum rate permitted by law.  For the avoidance of doubt, no Member Loans are permitted while the Churchill Loan is outstanding.

(c)    No Third Party Beneficiary Rights.  The provisions and obligations of the Members in this Section 8.2 are enforceable against and inure to the benefit of only the Members of the Company and the members of the Members.  No other third party beneficiary rights are created or inferred.  No Member or its heirs or assigns shall have personal liability for a default by any Member of the obligations contained in this Section 8.2.

8.3.    Withdrawal or Reduction of Member's Contribution to Capital.  Except with respect to Churchill Member's Capital Contribution provided for in Section 9.1(i) below, a Member shall not receive out of the Company's property any part of such Member's Capital Contribution until all liabilities of the Company, except liabilities of Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

# ARTICLE IX.

## DISTRIBUTIONS TO MEMBERS

9.1.    Distribution of Cash From Operations and Cash From Capital Transactions.

9.1.1    Prior to the Churchill Payoff Date, all Cash From Operations and Cash from Capital Transactions shall be utilized by the Company to repay the Churchill Loan until the Churchill Loan is paid in full.

9.1.2    To the extent practicable, Cash from Capital Transactions shall be paid in accordance with this Section 9.1.2 no later than three (3) days following the appliacble Capital Transaction;

9.1.3    From and after the Churchill Payoff Date, and after payment in full of any Approved Financing for the period in which the applicable distribution of Cash From Operations is made, the Company shall distribute Cash From Operations and Cash from Capital Transactions to the Members in such amounts and at such times as the Managing Member shall determine, but not less often than quarterly.  All such distributions shall be made in the following order of priority:

(i)     two hundred and fifty thousand and 00/100 Dollars ($250,000) to Churchill Member; and then

(ii)    to any Member who made a Member loan to the Company in accordance with Section 8.2(b), pro-rata in proportion to and in payment of (x) first, accrued and unpaid interest on such Member loan and (y) second, the unpaid principal amount of such Member loan; and then

(ii)    the next three million five hundred thousand and 00/100 Dollars ($3,500,000.00) to DS Member; and then

(iii)   the next three million five hundred thousand and 00/100 Dollars ($3,500,000.00) to Churchill Member; and then

(iv)    the balance, if any, shall be distributed to the Members in proportion to their Percentage Interests.

9.2.    <u>Limitation Upon Distributions</u>.  No distribution shall be made to Members if prohibited by the Act.

9.3.    <u>Interest On and Return of Capital Contributions</u>.  No Member shall be entitled to interest on such Member's Capital Contribution or to a return of its Capital Contribution, except as otherwise specifically provided for herein.

9.4.    <u>Priority and Return of Capital</u>.  No Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions, except to Churchill Member and as otherwise specifically provided for herein.  This Section 9.4 shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

## ARTICLE X.

## <u>ALLOCATIONS OF NET PROFITS AND NET LOSSES</u>

10.1    <u>Generally</u>.  The Company's Net Profit and Net Loss attributable to each Fiscal Year shall be determined as though the books of the Company were closed as of the end of such Fiscal Year.  The rules of Sections 10.1 and 10.2 shall apply except as provided in Section 10.3.

10.2    <u>Allocation of Net Profits and Net Losses</u>:

(a)    For each Fiscal Year, after all allocations have been made pursuant to Section 10.3, items comprising Net Profit or Net Loss shall be allocated so as to make, as nearly as possible, each Member's Percentage Interest equal to the result (be it positive, negative or zero) of subtracting (i) the sum of (x) such Member's share of Company Minimum Gain and (y) such Member's share of Member Minimum Gain, from (ii) such Member's Target Amount (as defined in Section 10.2(c) below) at the end of such Fiscal Year.

(b)    Except to the extent otherwise required by applicable law: (i) in applying subsection (a), to the extent possible each item comprising Net Profit or Net Loss shall be allocated among the Members in the same proportions as each other such item, and, to the extent permitted by law, each item of credit shall be allocated in such proportions; and (ii) to the extent necessary to produce the result prescribed by subsection (a), items of income and gain shall be allocated separately from items of loss and deduction, in which event the proportions applicable to items of income and gain shall (to the extent permitted by law) be applicable to items of credit.

(c)    For these purposes, the "Target Amount" of a Member at the end of any Fiscal Year means the amount which such Member would then be entitled to receive if, immediately following such Fiscal Year: (i) all of the assets of the Company were sold for cash equal to their respective Book Basis (or in the case of assets subject to a Nonrecourse Liability or a "partner nonrecourse debt liability" as defined in Section 1.704-2 of the Regulations, the amount of such liabilities if greater than the aggregate Book Basis of such assets); and (ii) the proceeds of such sale were applied to pay all debts of the Company with the balance distributed as provided in Section 9.1, provided, however, that if the sale described in clause (i) would not generate proceeds sufficient to pay all debts of the Company, the Members shall be considered entitled in the aggregate (and as among them in proportion to their respective Percentage Interest) to receive, pursuant to Section 9.1, a negative amount equal to the excess of such debts over such proceeds.

(d)    It is the intention of the Members to allocate Net Profits and Net Losses in such a manner as to cause each Member's Capital Account to always equal the amount of cash such Member would be entitled to receive if the Company sold its assets for their Book Basis and, after satisfying all Company liabilities, the proceeds from such sale, as well as all other funds of the Company, were then distributed to the Members pursuant to Section 9.1. These provisions shall be so interpreted as necessary to accomplish such result

10.3    Special Allocations.    Notwithstanding Sections 10.1 and 10.2 above, the following special allocations (the "Special Allocations") may be made for each Fiscal Year in the following order of descending priority; provided however, that any decision to make a Special Allocation is a Major Decision:

(a)    Company Minimum Gain. Except as otherwise provided in Regulations Section 1.704-2(f), if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in proportion to and to the extent of, an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). This Section is intended to

25

comply with the chargeback of items of income and gain requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Minimum Gain Attributable to Member Nonrecourse Debt.    Except as otherwise provided in Regulations Section 1.704-2(i), if there is a net decrease in Minimum Gain Attributable to Member Nonrecourse Debt during any Fiscal Year, each Member with a share of Minimum Gain Attributable to Member Nonrecourse Debt shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in proportion to, and to the extent of, an amount equal to the portion of such Member's share of the net decrease in the Minimum Gain Attributable to Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  This Section is intended to comply with the chargeback of items of income and gain requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4),(5) or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the adjusted capital account deficit (as such term is used in Regulations Section 1.704-1(b)(2)(ii)(d)) of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.3(c) shall be made only after all other allocations provided for in this Section 10.3 have been tentatively made as if this Section 10.3(c) were not in this Agreement.  This Section 10.3(c) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d)(3) of the Treasury Regulations, and is to be interpreted to the extent possible, to comply with the requirements of such Regulation as it may be amended or supplemented from time to time.

(d)    Nonrecourse Deductions.    Nonrecourse Deductions for any Fiscal Year shall be allocated to the Members in the same ratios that Profit is allocated for the Fiscal Year in accordance with Regulations Section 1.704-2(b)(1).

(e)    Member Nonrecourse Deductions.    Member Nonrecourse Deductions for any Fiscal Year shall be allocated one hundred percent (100%) to the Member that bears the economic risk of loss (as defined in Regulations Section 1.704-2(b)) with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).  If more than one Member bears the economic risk of loss with respect to a Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable thereto shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss.

(f)    Curative Allocations.    The allocations set forth in Sections 10.3(a) through 10.3(e) (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2(b).  Notwithstanding any other provisions of this Section 10.3 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the

Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

10.4    Code Section 704(c).    In accordance with Code Section 704(c) and the Regulations thereunder and Regulations Section 1.704-1(b)(4)(i), income, gain, loss and deduction (as computed for federal income tax purposes) with respect to any property contributed to the capital of the Company or otherwise revalued on the books of the Company shall, solely for federal income tax purposes, be allocated among the Members to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value as determined at the time of the contribution or revaluation.    Any elections or other decisions relating to such tax allocations shall be made by the Managing Member.

10.5    Allocations with Respect to Transferred Membership Interests.    In the event of a transfer of an Interest in the Company, regardless of whether the transferee becomes a Member, all items of income, gain, loss, deduction and credit for the Fiscal Year in which the transfer occurs shall be allocated for federal income tax purposes between the transferor and the transferee on the basis of the ownership of the interest at the time the particular item is taken into account by the Company for federal income tax purposes, except to the extent otherwise required by Section 706(d) of the Code.    Distributions made on or after the effective date of transfer shall be made to the transferee, regardless of when such distributions accrued on the books of the Company.    The effective date of the transfer shall be (i) in the case of a voluntary transfer, the actual date the transfer is recorded on the books of the Company, or (ii) in the case of an involuntary transfer, the date of the operative event.

10.6    Code Section 754 Election.    Upon a transfer of an Interest, the Company Representative may, at the request of the transferor or the transferee, make an election on behalf of the Company pursuant to Section 754 of the Code and pursuant to corresponding provisions of applicable state and local tax laws, to adjust the basis of the assets of the Company pursuant to Sections 734 (relating to distributions) and 743 (relating to transfers of Membership Interests) of the Code.

10.7    Alternative Allocations.    It is the Members' intention that each Member's distributive share of income, gain, loss, deduction, credit (or item thereof) be determined and allocated consistently with the provisions of the Code, including Sections 704(b) and 704(c) of the Code.    If the Managing Member deems it necessary in order to comply with the Code, the Managing Member may, relying upon the advice of the Company's accountants, allocate income, gain, loss, deduction or credit (or items thereof) arising in any year differently than as provided for in this Article X if, and to the extent, (a) allocating income, gain, loss, deduction or credit (or item thereof) would cause the determinations and allocations of each Member's distributive share of income, gain, loss, deduction or credit (or item thereof) not to be permitted by the Code and any applicable Regulations or (b) such allocation would be inconsistent with a Member's interest in the Company taking into consideration all facts and circumstances.    Any allocation made pursuant to this Section 10.7 will be a complete substitute for any allocation otherwise provided for in this Agreement, and no further amendment of this Agreement or approval by any Member is necessary to effectuate such allocation.    In making any such allocations under this Section 10.7 ("New Allocations") the Managing Member may act in

27

reliance upon advice of counsel to the Company or the Company's regular accountants that, in either case, in their respective opinions after examining the relevant provisions of the Code and any current or future proposed or final Regulations, the New Allocations are necessary in order to ensure that, in either the then-current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction or credit (or items thereof) is determined and allocated in accordance with the Code and such Member's interest in the Company.  New Allocations made by the Managing Member in reliance upon the advice of counsel or accountants as described in this section will be deemed to be made in the best interests of the Company and all of the Members consistent with the duties of the Managing Member under this Agreement and any such New Allocations will not give rise to any claim or cause of action by any Member against the Company or any Managing Member.

## ARTICLE XI.

## BOOKS AND RECORDS

11.1.    <u>Accounting Period</u>.  The Company's accounting period shall be the Fiscal Year.

11.2.    <u>Maintenance of Books and Records</u>.  The Company shall maintain at its principal place of business (as set forth in Section 2.3 of this Agreement) separate books of accounts for the Company which shall show a true and accurate record of all costs and expenses incurred, all changes made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement.

11.3.    <u>Access to Books, Records, etc</u>.  Any  Member or any duly authorized agents or representatives of such  Member, at such  Member's own expense and upon reasonable notice to the Managing Member, may visit and inspect any of the properties of the Company and examine any information it may reasonably request and make copies of and abstracts from the financial records and books of account of the Company, and discuss the affairs, finances and accounts of the Company with the Managing Member and the Accountants of the Company, all at such reasonable times and as often as such  Member or any agents or representatives of such Member may reasonably request.

11.4.    <u>Additional Notices to the Members</u>.  The Managing Member shall:

(a)    Provide the Members with year-end financial statements of the Company (including a balance sheet as of the end of such year) and related statements of income, and cash flows, on or about the later to occur of (i) such year and related footnotes, or (ii) receipt by Managing Member of such information and changes in Members' equity for such year and related footnotes.

(b)    Provide the Members with the following by the first week of June of each calendar year (or if later, upon receipt by Managing Member of such information): (i) a computation of the distributions to such Member and the allocation to such Member of the profits or losses, as the case may be, during the prior calendar year; and (ii) a Schedule K-1, each as shall be necessary for the preparation by such Members of a Federal, State and local income tax return for the prior calendar year.

(c)      Promptly notify the Members of all facts, information, projections or other matters known to the Managing Member that could be reasonably expected to have a material adverse impact on the economic interests of such Members in respect of the Company.

11.5.   Tax Returns.  The Managing Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. The Managing Member shall provide the Members, for their approval of the same, true and correct copies of all such returns and pertinent information therefrom no later than sixty (60) days after the end of the fiscal year and the Members shall have thirty (30) days after receipt thereof to consent to such returns being so filed.  Upon filing, true and correct copies of such returns and pertinent information therefrom shall be furnished to the Members within forty-five (45) days thereafter.

## ARTICLE XII.

## **TRANSFERABILITY**

12.1.   General Prohibition.  Except as provided in in this Agreement, and in all events subject to Section 17.24 below, no Member or Economic Interest Owner may assign, convey, sell, transfer, exchange, liquidate, encumber, or in any way dispose of or alienate (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) (collectively a "Transfer"), all or any part of its Interest without the prior written consent of all of the Members.  Any act in violation of this Article 12 shall, to the fullest extent permitted by law, be null and void ab initio. The approval of any such transaction in any one or more instances shall not limit or waive the requirement for such approval in any other or future instance.  Notwithstanding the foregoing, the Members may (i) Transfer their Interests in the Company to each other or (ii) Transfer their Interests to (A) a Person acquiring such interest by devise or descent or by operation of law upon the death of either or both of them, (B) one or more of their immediate family members or (C) a trust for the benefit of either or both of them or their immediate family members; provided, that in each case with respect to DS Member, Gary Segal shall, directly and/or indirectly, collectively maintain sole control of DS Member and (y) Gary Segal shall maintain not less than $1,000,000.00 of cash capital invested in DS Member; and (iii) Churchill Member may transfer its interest to its investors, who will succeed to the rights and interests of Churchill Member, so long as Silverpoint Entity shall control such interest following such transfer. Any such Transfers also must comply with applicable law and any existing financing which encumbers the Property.  As used in this Section 12.1, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the overall and day-to-day management and policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, without the consent or action of any other Person.  Notwithstanding anything herein to the contrary, no Member may transfer any interest (whether directly or indirectly) to an Excluded Person.

12.1.1. Conditions of Admission.  A transferee of an Interest shall become a Member only if the following conditions have been satisfied:

    (a) the transferor, his legal representative or authorized agent must have executed a written instrument of transfer of such Interest in form and substance satisfactory to the Managing Member;

    (b) the transferee must have executed a written agreement, in form and substance satisfactory to the Managing Member to assume all of the duties and obligations of the transferor under this Agreement with respect to the transferred Interest and to be bound by and subject to all of the terms and conditions of this Agreement;

    (c) the transferor, his legal representative or authorized agent, and the transferee must have executed a written agreement, in form and substance satisfactory to the Managing Member to indemnify and hold the Company, the Managing Member and the other Members harmless from and against any loss or liability arising out of the transfer;

    (d) the transferee must not be an Excluded Person;

    (e) the transferee must have executed such other documents and instruments as the Managing Member may deem necessary to effect the admission of the transferee as a Member; and

    (f) the transferee or the transferor must have paid the expenses incurred by the Company in connection with the admission of the transferee to the Company.

    A permitted transferee of an Economic Interest who does not become a Member shall be an Economic Interest Owner only and shall be entitled only to the transferor's Economic Interest to the extent assigned.  Such transferee shall not be entitled to vote on any question regarding the Company, and the Percentage Interest associated with the transferred Economic Interest shall not be considered to be outstanding for voting purposes. Notwithstanding anything herein to the contrary, no Excluded Person may be an Economic Interest Owner.

    12.2. <u>Successors as to Economic Rights and Obligations</u>.  References in this Agreement to Members shall also be deemed to constitute a reference to Economic Interest Owners where the provision relates to economic rights and obligations.  By way of illustration and not limitation, such provisions would include those regarding Capital Accounts, distributions, allocations, and contributions.  A transferee shall succeed to the transferor's Capital Contributions and Capital Account to the extent related to the Economic Interest transferred, regardless of whether such transferee becomes a Member.

## ARTICLE XIII.

## <u>DEADLOCK AND FORCED SALE</u>

    13.1. <u>Mediation</u>. If Churchill Member and DS Member shall be unable to agree within ten (10) business days of notice from the other of any decision to be made and undertaken by or for the Company, the parties will submit to Mediation.  Each Mediation session is not to exceed five (5) hours and all Mediation sessions must be completed within ten (10) business days from

the start of the first Mediation session.  If Churchill Member and DS Member are unable to agree after three (3) Mediation sessions a deadlock (a "Deadlock") shall have occurred.

13.2.   Calling Forced Sale.

13.2.1. Churchill Member may deliver written notice to DS Member exercising Churchill Member's right to a Forced Sale (a "Forced Sale Notice") if: (i) a Deadlock has occurred after Upzoning Completion, (ii) an Event of Default under the Churchill Loan has occurred and is continuing following the expiration of any applicable notice or cure periods, or (iii) on or after the maturity date of the Churchill Loan (and provided that the Churchill Payoff has not previously occurred).

13.2.2. So long as the Churchill Loan is not outstanding, DS Member may deliver a Forced Sale Notice if a Deadlock has occurred after Upzoning Completion.

13.3.   Forced Sale. Following the Members' receipt of the Forced Sale Notice, the Company shall proceed to sell the Property in accordance with the Approved Sale Procedures. To the extent that any Member is selected as the winning bidder pursuant to the Approved Sale Procedures (the "Purchasing Member"), and such Purchasing Member either (i) fails to close on the purchase of the Property in accordance with its bid, or (ii) commences any proceeding in order to delay the closing of such purchase, such Purchasing Member shall forfeit all Membership Interests herein and shall be removed immediately as a Member.

## ARTICLE XIV.

## DISSOLUTION AND TERMINATION

14.1.   Dissolution.

(a)   The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(i)   The approval of all of the Members; or

(ii)   The termination of the legal existence of the last remaining Member or the occurrence of any event which terminated the continued existence of the last remaining Member, unless the Company is continued in accordance with paragraph (b) below.

(b)   Notwithstanding any other provision of this Agreement, upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a member of the Company (other than upon an assignment by the last remaining Member of all of its limited liability company interest in the Company and the prior or simultaneous admission of the transferee pursuant to the provisions hereof), to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the

Company, effective as of the occurrence of the event that terminated the continued membership of such Member in the Company.

Notwithstanding the foregoing, prior to Churchill Payoff, the prior written consent of Churchill Member (which consent may be given or withheld in the sole and absolute discretion of Churchill Member) shall be required to dissolve the Company.

14.2.    Effect of Dissolution.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Act.  Upon dissolution, the Managing Member shall file a statement of commencement of winding up and publish the notice permitted by the Act.

14.3.    Winding Up, Liquidation and Distribution of Assets.

(a)    Upon dissolution, an accounting shall be made by the Company's Accountants, of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Managing Member or Liquidator, as the case may be, shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Managing Member shall:

(1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managing Member may determine to distribute any assets to the Members in kind);

(2)    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article X hereof;

(3)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingencies or liabilities of the Company;

(4)    Distribute the remaining assets to the Members, either in cash or in kind, in accordance with Section 9.1of this Agreement; and

(5)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by an independent appraisal or by the agreement of the Members and the Managing Member.  Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Agreement to reflect such deemed sale.

(c)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations

and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital Account.

(d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)    In the event that the Liquidator is other than the Managing Member, the Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Article 14 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(f)    To the fullest extent permitted by law and subject to the provisions herein, in the event that the Liquidator is a Person other than the Managing Member, the Company shall indemnify, save harmless, and pay all judgments and claims against, such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, officer, director, agents or employees in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the gross negligence, fraud, or willful misconduct of the Liquidator or any Members, officers, directors, agents or employees of the Liquidator.

14.4.    Articles of Dissolution.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, articles of dissolution evidencing such termination may be executed and filed in accordance with the Act.

14.5.    Return of Contribution Nonrecourse to Other Members.  Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Member's Capital Account.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Account of one or more Members, including, without limitation, all or any part of that Capital Account attributable to Capital Contributions, then such Member or Members shall have no recourse against any other Member.

## ARTICLE XV.

### [INTENTIONALLY OMITTED]

## ARTICLE XVI.

### **MEMBER REPRESENTATIONS AND WARRANTIES**

Each Member, desiring to be admitted to the Company as a Member, and as a material inducement to the Managing Member to consent to the admission of such Member to the

Company, hereby represents and warrants to the Managing Member, the Company and the other Members of the Company that:

(a)    Such Member is acquiring an interest in the Company for such Member's own account for investment and not with a view to distribution or resale, in whole or in part;

(b)    Such Member understands that the sale of Membership Interests to the Members admitted hereby is not being registered under federal or state securities laws based in part on the representations and warranties by the Member hereunder;

(c)    Such Member is an accredited investor, as defined in Rule 501(a) of SEC Regulation D, promulgated under the Securities Act of 1933, and his net worth exceeds at least fve times his investment in the Company;

(d)    Such Member has no reason to anticipate any change in personal circumstances, financial or otherwise, which may cause or require any sale or distribution of such interest;

(e)    Such Member will under no circumstances transfer, sell, or otherwise dispose of all or any portion of its interest in the Company in any manner that will violate this Agreement, the Securities and Exchange Act, or the laws and regulations of any state or local governmental agency having jurisdiction thereof.  Any transferre of an Interest shall be required to make and execute a similar representation regarding their investment;

(f)    Such Member is familiar with the nature of and risks attending investments in real estate and securities and has determined on the basis of consultation with such Member's business and tax advisers that the purchase of a Membership Interest in the Company is consistent with such Member's investment objectives and income prospects (all documents, records and books pertaining to the investment being made by such Member having been made available to such business and tax advisors);

(g)    Such Member is capable of losing his entire investment in the Company without incurring undue hardship;

(h)    All information provided by such Member to the Managing Member or counsel for the Managing Members concerning such Member's investor status, financial position, and experience in financial, tax, and business matters is correct and complete as of the Effective Date;

(i)    Such Member and his advisers have had, and will continue to have, full and complete access to all books, records, investment and any questions so posed have been answered by the Managing Member to such Member's full satisfaction, and have had a reasonable opportunity to obtain such additional information necessary to verify the accuracy of the information so provided;

(j)    That no oral representation has been made and no oral information furnished to such Member in connection with the Company which was in any way inconsistent with any written information so furnished;

(k)      That no information has been furnished and no representations made by the Managing Member regarding the tax benefits, if any, to be derived from an investment in the Company;

(l)      Such Member is aware that no trading market for Membership Interests in the Company will exist at any time and that such Membership Interest will at no time be freely transferable or transferable without potential adverse tax consequences;

(m)      Such Member is acquiring its Membership Interests through direct communication between such Member and/or his representatives and the Managing Member;

(n)      Such Member acknowledges that any projections furnished to the Members are for illustrative purposes only and no assurance can be given that the actual results of operation of the Company will correspond to such projections;

(o)      Such Member acknowledges that there is no assurance whether tenants at the Property will renew their leases, or if they do not renew their leases, whether, and the rent at which, the Company will be able to relet such space to other tenants;

(p)      Such Member acknowledges that it is purchasing its Membership Interest in the Company without being furnished any offering literature, prospectus or memorandum, and that this offering has not been scrutinized by the Attorney General of the any State (the "Attorney General") as a registration, and because of the Managing Member's representation of the small number of persons participating as Members, the private aspects of this offering and the pre-existing relationships of the Members to the Managing Member and/or its or their Affiliates and principals and the sophistication and suitability of the Members, the Managing Member has not applied for nor been issued an exemption from filing an offering statement by the Attorney General;

(q)      Each Member that is not a trust or individual is a corporation, partnership or a company or limited liability company is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the corporate, partnership or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership, or company action. This Agreement constitutes the legal, valid, and binding obligation of such Member;

(r)      Neither the execution, delivery, and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any

arbitrator, applicable to such Member or any of its wholly owned Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, company agreement or limited liability company agreement of such Member or any of its wholly owned Affiliates or of any material agreement or instrument to which such Member or any of its wholly owned Affiliates is a party or by which such Member or any of its wholly owned Affiliates is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member or any of its wholly owned Affiliates is a party or by which such Member or any of its wholly owned Affiliates is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or any of its wholly owned Affiliate;

(s)     Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date;

(t)     There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member or any of its wholly owned Affiliates, threatened against or affecting such Member or any of its wholly owned Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member; and such Member or any or its wholly owned Affiliates has not received any currently effective notice of any default, and such Member or any of its wholly owned Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member;

(u)     Neither such Member nor any of its Affiliates is, nor will the Company as a result of such Member holding an interest therein be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. Neither such Member nor any of its Affiliates is, nor will the Company as a result of such Member holding an Interest therein be, a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company" as defined in, or subject to regulation under the Public Utility Holding Company Act of 1935;

(v)     Neither such Members nor any direct or indirect owner of the Member (A) is included on any Government List (as defined below), (B) is a person who has been determined by competent authority to be subject to the prohibitions contained in the Presidential Executive Order No. 13224 or any other similar prohibitions contained in the rules and regulations of the OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (C) has been indicted or convicted of any Patriot Act Offenses (as defined below), or (D) is currently under investigation by any governmental authority for alleged criminal activity.  Notwithstanding any provision herein to the contrary, the Member covenants that the Member shall not Transfer any portion of the Interest, or permit the Transfer of any direct or indirect ownership interest in the Member, to any person that (I) is included on any Government List, (II) has been determined by competent authority to be subject to the prohibitions contained in the Presidential Executive Order No. 13224 or any other similar prohibitions contained in the rules and regulations of the OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (III) has been indicted or convicted of any Patriot Act Offenses, or (IV) is currently under investigation by any governmental authority for alleged criminal activity.  The Member further covenants that it shall immediately notify the Company if the Member has knowledge (or otherwise becomes aware) that any direct or indirect owner of the Member (w) is included on any Government List, (x) has been determined by competent authority to be subject to the prohibitions contained in the Presidential Executive Order No. 13224 or any other similar prohibitions contained in the rules and regulations of the OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (y) has been indicted or convicted of any Patriot Act Offenses, or (z) is currently under investigation by any governmental authority for alleged criminal activity.

For purposes of this paragraph (v):

(i)     "Government List" means (x) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (y) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, or (z) any similar list maintained by the United States Department of State, the United States Department of Commerce or any other governmental authority or pursuant to any Executive Order of the President of the United States of America.

(ii)     "OFAC" means the Office of Foreign Asset Control, U.S. Department of the Treasury.

(iii)     "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(iv)     "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (v) the criminal laws against terrorism, (w) the criminal laws against money laundering, (x) the Bank

37

Secrecy Act, as amended, (y) the Money Laundering Control Act of 1986, as amended, or the (z) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

## ARTICLE XVII.

## MISCELLANEOUS PROVISIONS

17.1.   <u>Application of Delaware Law</u>.   This Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the Act.

17.2.   <u>No Action for Partition</u>.  No Member has any right to maintain any action for partition with respect to the property of the Company.

17.3.   <u>Execution of Additional Instruments</u>.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

17.4.   <u>Construction</u>.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

17.5.   <u>Headings</u>.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

17.6.   <u>Waivers</u>.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

17.7.   <u>Rights and Remedies Cumulative</u>.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

17.8.   <u>Exhibits</u>.  All exhibits referred to in this Agreement and attached hereto are incorporated herein by this reference.

17.9.   <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

17.10.   <u>Creditors</u>.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any Person not a party hereto.

17.11. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of such counterparts shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.  This Agreement may be executed and delivered by fax (telecopier) and Portable Document Format (PDF); any original signatures that are initially delivered by fax shall be physically delivered with reasonable promptness thereafter.

17.12. <u>Company Representative</u>.  The Managing Member shall serve as the "partnership representative" (within the meaning of Section 6223(a) of the Code, as amended by Title XI of the Bipartisan Budget Act of 2015 (such Title XI, including the corresponding provisions of the Code impacted thereby, and any corresponding provisions of state or local income tax law, as the same may be amended from time to time, the ("BB Act")) (any Person so designated as the partnership representative is referred to herein as the "Company Representative").  The Company Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code, as amended by the BB Act, or the Treasury Regulations.  The Company Representative shall have the sole authority to act on behalf of the Company under the Code, as amended by the BB Act, and in any tax proceedings brought by other taxing authorities, and the Company and all the Members shall be bound by the actions taken by the Company Representative in such capacity. In the event of an audit by the IRS, the Managing Member shall have the right to cause the Company to make an election under Section 6221(b) (if available) or Section 6226 of the Code (as amended by the BB Act and as thereafter amended) with respect to any Company taxable year.

(a)    If the Company Representative makes a timely election under Section 6226(a) of the Code (as amended by the BB Act and as thereafter amended), the Company Representative shall furnish to each Member (or former Member) for the year under audit a statement reflecting the Member's (or former Member's) share of the adjusted items as determined in the notice of final partnership adjustment, and each such Member (or former Member) shall take such adjustment into account as required under Section 6226(b) of the Code, as amended by the BB Act, and shall be liable for any related interest, penalty, addition to tax, or additional amounts.

(b)    If and to the extent the Company Representative does not elect to have Section 6226 of the Code (as amended by the BB Act and as thereafter amended) apply to any adjustment, the Company shall make any payments of assessed amounts under Section 6221 of the Code (as amended by the BB Act and as thereafter amended) and shall allocate any such assessment among the current or former Members of the Company for the "reviewed year" to which the assessment relates in a manner that reflects the current or former Members' respective interests in the Company for that reviewed year based on such Member's share of such assessment as would have occurred if the Company had amended the tax returns for such reviewed year and such Member incurred the assessment directly (using the tax rates applicable to the Company under Section 6225(b) of Code, as amended by the BB Act).  To the extent that the Company is assessed amounts under Section 6221(a) of the Code, as amended by the BB

Act, each current or former Member to which this assessment relates shall pay to the Company such Member's share of the assessed amounts, including such Member's share of any additional accrued interest assessed against the Company relating to such Member's share of the assessment, upon thirty (30) days of written notice from the Company Representative requesting the payment.  The provisions contained in this Section 17.12 shall survive the dissolution of the Company and the withdrawal of any Member or the assignment of any Member's interest in the Company.

17.13.  <u>Notices</u>.  Any and all notifications, notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand-delivered (either in person by the party giving such notice, or by its designated agent, or by commercial courier) or (ii) on the third (3rd) business day following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage pre-paid, certified mail, return receipt requested, with the United States Postal Service, and addressed to the other party at such party's respective address as follows, or at such other address as the other party may hereafter designate by Notice: (a) if to the Company, at the address set forth in <u>Section 2.3</u>; (b) if to Managing Member, at the address set forth in <u>Section 2.3</u>; and (c) if a Member, to the address listed on the respective signature page of such Member.

17.14.  <u>Certification of Non-Foreign Status</u>.  In order to comply with Section 1445 of the Code and the applicable Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Regulations, each Member shall provide to the Company an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, (iii) that the Member is not a foreign person as that term is defined in the Code and Regulations, and (iv) that the Member is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Managing Member to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

17.15.  <u>Amendments</u>.  Any amendment to this Agreement shall be made in writing and signed by all of the Members.

17.16.  <u>Invalidity</u>.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Act, the provisions of this Agreement shall control to the fullest extent permitted by applicable law.  Any provision found to be invalid or unenforceable shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

17.17.  <u>Determination of Matters Not Provided For in This Agreement</u>.  The Managing Member shall decide any and all questions arising with respect to the Company and this Agreement which are not specifically or expressly provided for in this Agreement.

17.18.  <u>Further Assurances</u>.  The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

17.19.  <u>No Partnership Intended for Non-Tax Purposes</u>.  The Members have formed the Company under the Act, and expressly disavow any intention to form a partnership under the laws of the State of Delaware or any other state.  The Members do not intend to be partners as to each other or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

17.20.  <u>Integration</u>.  This Agreement embodies the entire agreement and understanding among the Members and amends, restates, replaces and supersedes all prior agreements and understandings among and between the Members relating to the subject matter hereof.

17.21.  <u>Governing Law, Jurisdiction and Venue</u>.  This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of Delaware (but not including the choice of law rules thereof).  Each of the Members consents to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York, New York with respect to all matters related to this Agreement and the transactions contemplated hereby. In connection therewith, the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York, New York shall be the non-exclusive venues to litigate questions of interpretation under this Agreement or the rights of the parties hereunder. EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE AMONG THE MEMBERS OR THEIR AFFILIATES OR AMONG A MEMBER (OR ITS AFFILIATES) AND THE COMPANY CONCERNING THIS AGREEMENT, THE COMPANY OR ITS ASSETS.

17.22  <u>Waiver of Action of Partition</u>. Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

17.23  <u>Prevailing Party</u>.  If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Member to enforce its rights under this Agreement against any other Member, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing Member in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Member; provided, that if a party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

17.24  <u>Article 8 of the Uniform Commercial Code</u>.

17.24.1     Each of the Membership Interests in the Company shall constitute a "security", as such term is defined in, and governed by, Article 8 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "UCC").  To the extent that any provision of this Agreement is inconsistent with any non-waiveable provision of Article 8 of the UCC, such provision of Article 8 of the UCC shall control.

17.24.2     The Membership Interests shall be evidenced by certificates, substantially in the form of such certificate set forth on **Exhibit E** annexed hereto and made a part hereof.  Each such certificate shall be executed by the Managing Member, in the name and on behalf of the Company.  As of the date hereof, certificates have been issued to each of the Members evidencing the percentage of the Membership Interests owned thereby, as set forth on Exhibit A annexed hereto and made a part hereof, each of which certificates in all respects shall constitute a "security certificate" (as such term is defined in the UCC).

17.24.3     The Company shall maintain books for the purpose of registering the transfer of Membership Interests.  The transfer of Membership Interests requires the delivery of an endorsed security certificate and shall be effected by the Company's registering of the transfer.  The Company shall notify the registered owner of the Membership Interests of any applicable restrictions on the transfer of the Membership Interests, and such restrictions shall be noted conspicuously on each certificate evidencing Membership Interests in the Company.

*[SIGNATURES BEGIN ON FOLLOWING PAGE]*

**IN WITNESS WHEREOF**, the undersigned have set their hands and seals as of the date first above written.

**MANAGING MEMBER:**

DS Partners LIC LLC,
a Delaware limited liability company


By:_____
     Name:  Gary Segal
     Title:   Manager


**MEMBERS:**

DS Partners LIC LLC,
a Delaware limited liability company


By:_____
     Name:  Gary Segal
     Title:   Manager


Churchill-SP QPS LLC,
a Delaware limited liability company


By:_____
     Name:
     Title:


THIS IS A SIGNATURE PAGE TO THE AMENDED
AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF AAGS HOLDINGS LLC AND
IS EXECUTED BY THE PARTY NAMED ABOVE

## EXHIBIT "A"

### Members

| Name | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| DS PARTNERS LIC LLC<br>CHURCHILL-SP QPS LLC | $3,500,000<br>$250,000 | 50%<br>50% |
| **Total** | **$3,750,000** | **100%** |

**<u>EXHIBIT "B"</u>**

**Initial Property Budget**

## **EXHIBIT "C"**

**Excluded Litigations**

## EXHIBIT "D"

### Approved Sale Procedures

(a)      The "Approved Sale Procedures" shall apply in connection with any Forced Sale:

(i)      Upon delivery of a Forced Sale Notice by either party, Churchill Member shall select a broker with not less than twenty (20) years of commercial real estate experience from one of (i) Eastdil, (ii) JLL, and (iii) CBRE (the "Broker") to conduct the marketing and sale of the Property.

The Broker shall manage the marketing process, which shall consist of the making each of the following determinations (collectively, the "Marketing Process"):

- the date for the submission of bids for the Property.
- those persons or entities who in Broker's professional judgment are likely to be qualified purchasers (each a "Broker Prospect").  Each Member shall be deemed a Broker Prospect.
- whether a "teaser" should be included with any notices to a Broker Prospect.
- whether or not any Broker Prospect should be excluded from the sale of the Property (and to provide to the Company the basis therefor).
- who will handle requests by Broker Prospects for "walk throughs".
- the process for making "chaser" calls or other "chaser" communications to Broker Prospects.

(ii)      The Marketing Process shall be no less than forty five (45) days and shall not exceed seventy five (75) days.  Members shall comply in all material respects with the recommendations of the Broker with respect to the Marketing Process.  Members shall be permitted to make recommendations regarding the Marketing Process, provided that no such recommendations shall materially modify these Approved Sale Procedures (other than those elements of the Marketing Process described above);

(iii)      Each Member shall deliver (via access to a datasite or physically) to the Broker, any due diligence materials that are in such Member's possession to the extent that such materials are reasonably necessary to permit a reasonable party to make an informed decision to bid at any proposed sale (collectively, the "Due Diligence Materials"), it being understood that the Due Diligence Materials will include (1) any and all information regarding the zoning entitlements for the Property, (ii) any loan documents for any loans then-encumbering the Property, (iii) any leases then-in effect for any portion of the Property, and (iv) any material contracts regarding construction at the Property, if any.  The Broker shall provide access to the Due Diligence Materials to (1) the Members, and (2) any other Broker Prospects, provided that each such Broker Prospect execute and deliver a confidentiality agreement that is reasonably satisfactory to the Churchill Member;

(iv)     no later than ten (10) days prior to the date of the Forced Sale, the Broker shall deliver to the Members a list of all prospective purchasers at the Forced Sale, and shall provide the terms of sale of each Broker Prospect expected to participate the in Forced Sale.

(b)     Except as provided for in clause (c) below, all bids will be cash bids with no financing conditions;

(c)     to the extent that the Churchill Loan remains outstanding, Churchill Member may credit bid the full amount outstanding under the Churchill Loan, which amount shall include, among other things, (1) any accrued but unpaid interest, including default interest, (2) the amount of any proactive advances made by Churchill Member, (3) any make whole or yield maintenance provisions, and (4) any reasonable attorney's fees actually incurred by Churchill Member to enforce its rights under the Churchill Loan (collectively, the "Churchill Credit Bid").  If no bid exceeds the amount of the Churchill Credit Bid, Churchill Member shall be deemed the purchaser;

(d) any Member, including DS Member, may bid at the Forced Sale, provided that no Member shall receive any right of first refusal, right of last offer, or break-up fee; and

(e) subject to section (c), above, the purchaser at the Forced Sale shall be determined by the unanimous decision of Churchill Member and DS Member, after consultation with the other Members, the Mediator, and the Broker; provided that if Churchill Member and DS Member are not able to agree upon the purchaser, the purchaser shall be determined by the Mediator.

## EXHIBIT "E"

## MEMBERSHIP INTEREST CERTIFICATE

Certificate Number ____                                                    ___% of Interests

**THE MEMBERSHIP INTERESTS EVIDENCED HEREBY ARE SUBJECT TO AN IRREVOCABLE PROXY AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER), AND BY ACCEPTING ANY INTEREST IN SUCH MEMBERSHIP INTERESTS, THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO, AND SHALL BECOME BOUND BY, ALL THE PROVISIONS OF SAID AGREEMENT.**

AAGS HOLDINGS LLC, a Delaware limited liability company having an address at 23-10 Queens Plaza South, Long Island City, New York (the **"Company"**), hereby certifies that _____, a _____ having an address at _____, (the **"Holder"**), is the registered owner of a _____ percent (___%) interest in the Company (the **"Interests"**). THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE INTERESTS ARE SET FORTH IN, AND THIS CERTIFICATE AND THE INTERESTS REPRESENTED HEREBY ARE ISSUED, AND SHALL IN ALL RESPECTS BE SUBJECT, TO THE TERMS AND PROVISIONS OF, THE FIFTH AMENDED AND RESTATED OPERATING AGREEMENT OF THE COMPANY, DATED AS OF NOVEMBER 13, 2019, AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME (THE **"AGREEMENT"**). THE TRANSFER OF THIS CERTIFICATE AND THE INTERESTS REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE AGREEMENT. By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Agreement. The Company will furnish a copy of the Agreement to the Holder without charge upon written request to the Company at its principal place of business. The Company maintains books for the purpose of registering the transfer of Interests.

Each limited liability company interest in the Company shall constitute a "security", within the meaning of, and governed by: (a) Article 8 of the Uniform Commercial Code (including, without limitation, Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York; and (b) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof, as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

This Certificate, shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to principles of conflicts of laws.

[signature page to follow]

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.


Dated: as of November __, 2019


AAGS HOLDINGS LLC,
a Delaware limited liability company

By:    DS PARTNERS LIC LLC,
       a Delaware limited liability company


By: _____
       Name: Gary Segal
       Title:   Manager

**REVERSE SIDE OF
LLC CERTIFICATE
AAGS HOLDINGS LLC
<u>(MEMBERSHIP INTEREST POWER)</u>**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (print or type name of Transferee), _____ (insert Social Security or other taxpayer identification number of Transferee), the following specified percentage of Interests: _____ (identify the percentage of Interests being transferred), and irrevocably constitutes and appoints _____, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____

**TRANSFEROR:**

AAGS HOLDINGS LLC,
a Delaware limited liability company

By:    DS PARTNERS LIC LLC,
       a Delaware limited liability company

By: _____
       Name: Gary Segal
       Title:  Manager